966 P.2d 33

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Kenneth ARRASMITH, Defendant–Appellant.**

**No. 22831.**

Court of Appeals of Idaho.

April 3, 1998.

Review Denied Oct. 29, 1998.

Mosman Law Offices; Roy E. Mosman and Craig W. Mosman, Moscow, for appellant. Craig W. Mosman argued.

Alan G. Lance, Attorney General; Michael A. Henderson, Deputy Attorney General, Boise, for respondent. Michael A. Henderson argued.

Before LANSING, C.J., and PERRY, J., and WALTERS, Acting J.

PER CURIAM.

A jury found Kenneth Arrasmith guilty of one count of first degree murder and one count of second degree murder for the

deaths of Luella Bingham and Ronald Bingham, respectively. I.C. §§ 18–4001, –4002 and –4003. As sentences for the murders, Arrasmith received a fixed life term and a concurrent term of twenty-five years to life. On appeal, Arrasmith asserts that the judgments of conviction and sentences should be overturned, claiming that he was denied a fair opportunity to present his defense as a result of various errors by the trial court. For the reasons explained below, we affirm the judgments of conviction and sentences.

## I.

### FACTS

On the afternoon of May 15, 1995, Arrasmith turned himself in to the Asotin County Sheriff's Office, in the state of Washington, after shooting Ronald and Luella Bingham at their automotive repair shop located on Shelter Road in Lewiston, Idaho. Law enforcement personnel were dispatched to the scene of the shooting, where the Binghams were found dead. Within days, Arrasmith was charged with two counts of first degree murder in the Nez Perce County district court in Idaho.

The events leading up to the fateful meeting between Arrasmith and the Binghams are as follows. In the spring of 1995, Cynthia Arrasmith, the fifteen-year-old daughter of Kenneth Arrasmith, and her boyfriend moved into the home of Ronald and Luella Bingham in Clarkston, Washington. In exchange for a place to live, Cynthia helped Luella with household chores and her boyfriend was to work on cars with Ronald at the Binghams' repair shop which was located in Lewiston, Idaho, across the Snake River from Clarkston, Washington. This arrangement was short-lived however, and the boyfriend was kicked out. Cynthia stayed on at the Binghams', spent much of her time in Luella's company, and rarely left the home except with Luella. Cynthia's mother, Linda Bartlett, knew where her daughter was living and believed that she was being cared for by the Binghams. Bartlett had gone to the Binghams' home to visit with her daughter and Luella on at least one occasion. Arrasmith learned of his daughter's living arrangements through telephone calls with Cynthia and her mother.

All of the individuals living at the Binghams' home during the time Cynthia resided there were using drugs on a daily basis. Cynthia regularly participated with Ronald and Luella in using methamphetamine and marijuana. This fact was not known to Cynthia's parents, nor were the sexual molestation and rapes perpetrated on Cynthia by the Binghams that Cynthia eventually revealed to her parents. Cynthia claimed that she did not try to extricate herself from the situation because she feared what Ronald Bingham might do.

When the lurid details of Cynthia's life with the Binghams came to light, her parents sought the assistance of the police in removing Cynthia from the Binghams' home. Based on the reported drug activity at the home, the police searched the house on April 17, 1995. The police found no drugs and determined that they had no basis to remove Cynthia from the home. Sometime later, Cynthia escaped and sought to get away from the Binghams by going to California. She was promptly picked up on a run-away report signed by Cynthia's mother and was detained in a juvenile detention facility for her safety.

Arrasmith took steps to aid the police in their investigation but became frustrated that the police had not arrested the Binghams and charged them with the sexual abuse and rape of his daughter. On May 17, 1995, wearing a gun in a shoulder holster and carrying another gun which he had partially concealed in a box, Arrasmith went to the Binghams' repair shop where he shot Ronald twenty-three times and Luella seven times. Luella had been shot six times in the back and Ronald's body was found under a vehicle he had been working on.

## II.

### ISSUES

Arrasmith asserts the following issues on appeal. First, he argues that the trial court should have granted his motion to dismiss under I.C. § 19–202A. Second, he contends the trial court erred in excluding character

evidence regarding the victims, the prior criminal record of Ronald Bingham, and the expert witness testimony of Doctor Lenore Walker. Third, he argues that he was denied his right to confront witnesses when the district court limited the defense's cross-examination of the police officers. Fourth, he contends that it was error for the trial court not to give an instruction based on I.C. § 19–202A and an instruction on voluntary manslaughter. Fifth, he asserts that the discovery of weapons at the murder scene, which information was withheld from the defense, warranted a new trial on the defense's motion. Sixth, he contends the sentences imposed were excessive and an abuse of the trial court's discretion. Lastly, he objects to the trial court's order authorizing the appointment of attorney Michael Kane to serve as a special deputy prosecutor to assist in the presentation of the state's case. We will discuss each issue in turn.

## III.

## ANALYSIS

### A. Pretrial Motions Based on I.C. § 19–202A

Arrasmith made two motions to the district court based on I.C. § 19–202A [1]: a motion in limine seeking a ruling admitting evidence of the Binghams' predatory sexual practices and a motion to dismiss. Primarily, Arrasmith argued to the district court that the statute provides for a "defense of others" defense which is separate and distinct from the general self-defense statutes. He argues on appeal that the district court erred in denying his motion in limine and his motion to dismiss, which were both heard prior to trial. Arrasmith urges the Court to interpret the statute to conclude that because the Binghams were sexual predators, Arrasmith could have a reasonable belief that there was imminent danger to others or that he was coming to the aid of someone who had been a victim.

The statute, which has not been cited, interpreted or explained by an appellate court since its enactment in 1974, states that no person shall be in legal jeopardy for actions taken "when coming to the aid of another whom he reasonably believes to be in imminent danger of or the victim of ... rape ... or other heinous crime." Arrasmith asserts that the statute spells out under what circumstances a person can take these actions, including coming to the aid of past victims of the Binghams, whose testimony he was prepared to present to the jury at trial. He also asserts that his actions in coming to the aid of a girl then living in the Binghams' home were reasonable because she was "in imminent danger of rape," as the Binghams' pattern of sexual abuse made clear. Finally, he asserts that in light of threats of harm to himself, his ex-wife and his daughter by the Binghams, he took reasonable steps to defend himself and his family.

In his motion to dismiss, Arrasmith argued that I.C. § 19–202A provided a complete defense to the charges. In support of his motion to dismiss, Arrasmith offered an affidavit from T.B., who allegedly had been raped by Ronald Bingham in 1975. At the hearing on the motion, counsel for the defense advised the district court of his intention to put on evidence at trial that Arrasmith learned that his daughter was repeatedly drugged and raped by the Binghams; that the Binghams had threatened to kill Cynthia, her mother and Arrasmith if Cynthia told anyone; that Arrasmith knew the Binghams had a history of abusing children, including a conviction for raping a babysitter, and that they also used controlled substances; that Arrasmith had been told that Ronald Bingham offered controlled substances to anyone who would kill Arrasmith; that Bingham told Arrasmith he would kill Arrasmith if he came near him and pointed an imaginary gun at Arrasmith, pulling the trigger; that Arrasmith knew another girl lived with the Binghams at the time of the alleged shootings; and that Arrasmith informed law enforce-

1. I.C. § 19–202A provides:
 No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary, or when coming to the aid of another whom he reasonably believes to be in imminent danger or the victim of aggravated assault, robbery, rape, murder or other heinous crime.

ment about the Binghams' child sexual abuse but the authorities failed to respond. Arrasmith also sought admission of evidence that he knew Ronald Bingham's reputation for using deadly weapons and for confrontational, violent behavior. Counsel argued at the pretrial motions that Arrasmith should be allowed to present evidence from victims of heinous crimes at the hands of the Binghams.

■ We examine Arrasmith's contentions in light of well-established rules of statutory construction. The plain, obvious and rational meaning is always preferred to any hidden, narrow or irrational meaning. *Higginson v. Westergard,* 100 Idaho 687, 691, 604 P.2d 51, 55 (1979). Presumably, "words and phrases are construed according to the context and the approved usage of the language...." I.C. § 73–113. In construing a statute, the focus of a court is to determine and give effect to the intent of the legislature, *George W. Watkins Family v. Messenger,* 118 Idaho 537, 540, 797 P.2d 1385, 1388 (1990), examining the literal wording of the statute and considering such extrinsic matters as context, objects in view, evils to be remedied, public policy and contemporaneous construction. *Chinchurreta v. Evergreen Management, Inc.,* 117 Idaho 588, 790 P.2d 369 (Ct.App.1989).

■ I.C. § 19–202A provides that no person in this state shall be placed in legal jeopardy "when coming to the aid of another whom he reasonably believes to be in imminent danger or the victim of aggravated assault, robbery, rape, murder or other heinous crime." A defendant, however, could not be "coming to the aid" of a victim when the crime against the victim is long past, as in the cases of the young women allegedly abused by the Binghams in 1972, 1980 and early in 1995. To accept Arrasmith's interpretation of the statute would not only condone vigilantism but also imply that the legislature intended to authorize private citizens to kill offenders to protect victims of the offender's past crimes which, even if prosecuted and punished by the state, would not carry a punishment of death. Such a reading of the statute would lead to an absurd result.

■ The district court correctly held that the words "the victim" do not mean victims against whom a crime has already been completed, but those who are presently being victimized when the accused steps forward to protect them. The district court did not err when it concluded that the statute only provides a defense to persons who come to the aid of someone in imminent danger or a victim of a crime *in progress.* Therefore, we uphold the denial of the motion to dismiss grounded on I.C. § 19–202A. Having determined that I.C. § 19–202A does not authorize a heretofore unavailable defense, we also reject Arrasmith's reliance on the statute as a vehicle to admit evidence of the Binghams' past predatory practices where he argued that to keep that evidence out would deny him the defense authorized under the statute. Because Arrasmith challenges the inadmissibility ruling on other grounds, we will address in turn the reasons articulated by the district court in excluding that evidence.

## B. Character Evidence

By way of a motion in limine, Arrasmith sought to admit evidence of the Binghams' earlier victims of sexual abuse, the Binghams' other crimes and bad acts, and Ronald's prior conviction for rape. The prosecution countered with a motion in limine seeking an order prohibiting the defendant and defense witnesses from testifying about the character and/or bad acts of the victims. The district court heard the motions, at which time Arrasmith argued that the evidence should be admitted as relevant to his self-defense theory under I.C. § 19–202A and Idaho Rules of Evidence (I.R.E.) ·404(a)(2) and 404(b). Arrasmith particularly urged the district court to admit evidence that the Binghams were sexual predators through the testimony of past victims of the Binghams. Arrasmith contended that because the Binghams were sexual predators, he could have a reasonable belief that there was imminent danger to others or a reasonable belief that he was coming to the aid of someone who had been the victim of the Binghams. The district court rejected Arrasmith's arguments and ruled the challenged evidence inadmissible except the evi-

dence relating to the Binghams' alleged abuse of Cynthia.

Arrasmith asserts on appeal that the district court erred in not admitting evidence of the Binghams' past sexual abuse of young women, Ronald's prior conviction for rape and Ronald's violent nature on the basis of I.R.E. 404(a) and I.C. § 19–202A. This evidence, Arrasmith argues, was relevant to explain his conduct and to show the reasonableness of his actions in defense of his daughter and "in coming to the aid of another whom he reasonably believed to be in imminent danger of or the victim of rape."

■ As a general proposition, evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion. I.R.E. 404(a). An exception to this rule, however, allows evidence of a pertinent trait of character of the victim offered by an accused to prove conduct. I.R.E. 404(a)(2). When character of the victim is offered to prove a fact other than his own conduct, however, Rule 404(a) does not apply. WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5237 (1978).

■ There are two generally recognized purposes for which evidence of character of a victim in a homicide case may be adduced. The evidence may serve to buttress a claim of self-defense and to establish that the victim was the first aggressor. The second use of evidence of the reputation of the deceased for violence is to show the defendant's reasonable apprehension of immediate danger. WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5231, n. 11 (1978). See State v. Dallas, 109 Idaho 670, 679, 710 P.2d 580, 589 (1985).

■ Adhering to precedent from the Idaho Supreme Court, the district court held that Rule 404(a)(2) does not extend to the admission of specific acts of the victims, for reasons that evidence of specific instances of conduct tends to be highly prejudicial and could lead the jury to acquit based on a conclusion that the victim merely "got what he deserved." See State v. Dallas, 109 Idaho at 679, 710 P.2d at 589. Hence, the victims' testimony of specific acts of sexual abuse by the Binghams was properly excluded. Furthermore, based upon a lack of evidence that the deceased had made some hostile demonstration at the time of the shooting in connection with his known character to arouse in Arrasmith a reasonable belief of imminent peril,[2] the district court found that Ronald's reputation for violence was inadmissible to support Arrasmith's claims of self-defense. We are satisfied that the district court recognized the constraints of Rules 404(a)(2) and 405[3] and correctly ruled inadmissible evidence of past abuse of young women tending to show that the Binghams were sexual predators and evidence that Ronald had a violent and confrontational nature.

■ The district court determined that character evidence from the past victims of the Binghams' sexual abuse and Ronald's prior conviction for rape were not relevant to any issue in Arrasmith's case. It is axiomatic that evidence which is not relevant is not admissible, I.R.E. 402. Therefore its exclusion by district court was not error. Having previously determined that this evidence was not admissible pursuant to Arrasmith's proffered defense under I.C. § 19–202A, we conclude that the past predatory sexual activities of the Binghams, Ronald's previous conviction for rape, and Ronald's violent nature do not tend to prove the existence of a fact of consequence in the murder case against Arrasmith. See I.R.E. 401; State v. Hocker, 115 Idaho 544, 768 P.2d 807 (Ct.App.1989). Therefore, we find no error in the district court's ruling excluding evidence of the victims' character.

---

2. Ronald was lying underneath a vehicle that he was working on when Arrasmith arrived and shot him. No weapons were found on or near Ronald's body.

3. I.R.E. 405 provides that in all cases in which evidence of character or a trait of character is admissible, proof may be made by testimony as to reputation or in opinion form. Specific instances of conduct are admissible only in cases in which character is an essential element of a charge, claim, or defense.

## C. Excluded State of Mind Evidence

Arrasmith argues that it was error for the district court to deny his request to call Doctor Lenore Walker, a noted psychologist, to testify on his behalf. Arrasmith argues that he was thus precluded from offering evidence going to his state of mind at the time of the shootings, which he claims served to negate the element of intent that was part of the state's case of first degree murder.

Where state of mind is an element of the offense, I.C. § 18–207(3) provides for the admission of expert evidence on the issue of mens rea, subject to the rules of evidence. *See State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991), *cert. denied,* 506 U.S. 915, 113 S.Ct. 321, 121 L.Ed.2d 241 (1992). The admission of expert testimony is conditioned upon proper notice so as to allow the opposing party a complete opportunity to consider the substance of such testimony and prepare for rebuttal. I.C. § 18–207(4)(a). Disclosure of a party's intent to call an expert to testify on an issue of mens rea is governed by I.C. § 18–207(4)(b) and must otherwise comply with the pretrial discovery orders of the district court under I.R.C.P. 16.

 The threshold test for the admission of expert testimony is whether the scientific, or other specialized knowledge of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. The function of the expert is to provide testimony on subjects that are beyond the common sense, experience and education of the average juror. *State v. Hester,* 114 Idaho 688, 694, 760 P.2d 27, 33 (1988), *quoting State v. Lindsey,* 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986). Where the normal experience and qualifications of lay jurors permit them to draw proper conclusions from given facts and circumstances, then expert conclusions or opinions are inadmissible. *Hester,* at 696, 760 P.2d at 35, *quoting State v. Lash,* 237 Kan. 384, 699 P.2d 49, 51 (1985).

 In this case, defense counsel indicated in an offer of proof that Doctor Walker had interviewed and conducted tests on the defendant although none of the doctor's notes, test data, reports or conclusions had been produced for the benefit of the prosecutor or the court. Nevertheless, defense counsel stated that Doctor Walker would testify regarding Arrasmith's emotional response to the abuse his daughter had suffered at the hands of the Binghams, including rape and sodomy, and the retention by them of evidence of that abuse in the form of pubic hair clippings. Doctor Walker was expected to offer testimony to the effect that Arrasmith did not intend to kill the Binghams and did not act with malice aforethought.

Based on the record before us, we conclude that the ultimate purpose of Doctor Walker's testimony was to evaluate the facts and circumstances of the murder as related to her by the defendant, the same evaluation that the jury would have to make in reaching its verdict on the issues in the case. For this reason and because the testimony did not appear to involve either scientific or technological concepts outside of the understanding or knowledge of the average juror, we conclude that Doctor Walker's testimony was properly held inadmissible. *See State v. Johnson,* 119 Idaho 852, 855, 810 P.2d 1138, 1141 (Ct.App.1991). We need not therefore address whether the district court erred in excluding the testimony on the alternative ground of defense counsel's alleged discovery violation.

## D. Limitation of Cross-examination was not a Violation of the Confrontation Clause

Arrasmith contends that he was denied his right to confront witnesses when the district court limited his counsel's cross-examination of the police officers who had conducted a search of the Binghams' home for drugs in April 1995, where fifteen-year old Cynthia Arrasmith was staying.[4] During cross-exam-

---

4. Officer Hastings testified that, at the time of the search, he was concerned for Cynthia and was looking for reasons to justify removing her from the home. He also testified about a conversation with Patty Johnson during which he asked whether she knew of any sexual encounters between Ronald Bingham and Cynthia. Officer Otmar testified as to his part in executing the search warrant and Officer Kelley, who had talked with Cynthia at the time of the search,

ination of the officers, defense counsel sought to uncover why the officers were concerned for Cynthia and what they knew of the Binghams' past involvement with young females. Counsel made an offer of proof submitting that the police were aware of a prior conviction for rape and other reported rapes of young girls by Ronald in 1978 and in the mid–80's that had been investigated by local police. After hearing argument, the district court adhered to its pretrial ruling prohibiting inquiry into the officers' reasons for wanting to remove Cynthia from the Binghams' home. The district court held that the knowledge of the officers was not relevant and did not in any way advance the defendant's case.

 The right of cross-examination is included in the right of confrontation as guaranteed by the Sixth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). A defendant's right to confront and cross-examine witnesses, however, is not absolute. *State v. Araiza,* 124 Idaho 82, 91, 856 P.2d 872, 881 (1993). The trial court may reasonably limit cross-examination that is harassing, confusing, repetitive or only marginally relevant. *Id., citing Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *State v. Downing,* 128 Idaho 149, 153, 911 P.2d 145, 149 (Ct.App. 1996). The control of cross-examination is a matter within the discretion of the trial court, *State v. Jesser,* 95 Idaho 43, 49, 501 P.2d 727, 733 (1972); *State v. Wheeler,* 109 Idaho 795, 798, 711 P.2d 741, 744 (Ct.App.1985), subject to an initial showing that the cross-examination is relevant. Thus, a trial court may abuse its discretion if it unreasonably limits cross-examination by foreclosing inquiry that appears to be material.

 "Relevant evidence" means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. I.R.E. 401. Relying on the offer of proof, the district court below determined that counsel had failed to show a connection between the officers' knowledge and Arrasmith's defense to the murder charges, and determined that the cross-examination was not relevant. Further, when, as in this case, the attempted cross-examination contravened the district court's pretrial order excluding evidence of the prior conviction and other character evidence, the district court correctly exercised its discretion in barring questions on cross-examination that sought to introduce inadmissible evidence to the jury notwithstanding the pretrial order. We conclude that the district court did not violate Arrasmith's constitutional right to confront witnesses by limiting counsel's cross-examination of the police officers.

**E. Refused Instructions**

 A defendant in a criminal case is entitled to have his theory of the case submitted to the jury under proper instructions. *State v. Johns,* 112 Idaho 873, 880–81, 736 P.2d 1327, 1334–35 (1987). However, refusal of the defendant's requested instructions allegedly dealing with his defense theory is not error where that proposed instruction is either erroneous in its statement of the law, is not supported by the evidence or constitutes an impermissible comment on the evidence, or is adequately covered by other instructions given by the court. *Id.* at 881, 736 P.2d at 1335. When reviewing the trial court's decision refusing a proposed instruction, the appellate court will consider the instructions given as a whole in order to determine whether the jury was fully and fairly instructed on the applicable law. *State v. Moore,* 126 Idaho 208, 880 P.2d 238 (1994); *State v. Eastman,* 122 Idaho 87, 831 P.2d 555 (1992). The question whether the jury has been properly instructed is a question of law over which an appellate court exercises free review. *State v. Gleason,* 123 Idaho 62, 65, 844 P.2d 691, 694 (1992).

 One of the proposed instructions denied by the district court recited verbatim

---

testified that he was determined to take Cynthia from the scene, although the officers eventually

left without her.

**44**

the language of I.C. § 19–202A, which was purported to be the defendant's "theory of the case" instruction. The district court refused the proposed instruction after concluding that I.C. § 19–202A did not change the law of justifiable homicide in Idaho and that the statute "does not operate in the absence of evidence of some immediacy, of some imminence of harm." The district court did give the jury the traditional self-defense instruction based on I.C. § 18–4009, which addresses defense of others but does not recite the language of I.C. § 19–202A. We conclude that the instructions given adequately covered the defense's theory of the case. Accordingly, we affirm the rejection of Arrasmith's proposed I.C. § 19–202A instruction. *See State v. Enno,* 119 Idaho 392, 405, 807 P.2d 610, 623 (1991); *State v. Bowman,* 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct. App.1993).

■■■ Arrasmith's second claim of error regarding jury instructions is that the district court should have given an instruction on voluntary manslaughter [5] as a lesser included offense of first degree murder, which was requested by both parties at trial. When the facts and the pleadings of the particular case justify it, the trial court has a duty to instruct the jury upon a lesser included offense. *State v. Eastman,* 122 Idaho at 90, 831 P.2d at 558; *State v. Drennon,* 126 Idaho 346, 352, 883 P.2d 704, 710 (Ct.App. 1994). If the court viewing all of the evidence presented at trial finds there is a reasonable view of the evidence to support the requested instruction, the court is required to instruct the jury on that lesser included offense. I.C. § 19–2132(b)(2); *State v. Thomasson,* 122 Idaho 172, 832 P.2d 743 (1992); *Medrano v. State,* 127 Idaho 639, 903 P.2d 1336 (Ct.App.1995).

■■■ At trial, the defense maintained that the killings were not premeditated, but were the reaction of a father to the sexual abuse perpetrated on his young daughter by the Binghams, a reaction to threats made by Ronald Bingham toward Arrasmith and his family, and a response to sexual abuse being perpetrated against another young girl living

in the Binghams' home. A review of the record, in particular the testimony of Arrasmith, discloses that he went to Ronald's shop wearing a shoulder holster containing a Ruger pistol and carrying a Tec–9 semiautomatic gun partially concealed in a box. There were cutouts in the box to expose the muzzle and the trigger of the gun, thus allowing it to be fired while still concealed in the box. Arrasmith testified that he also carried a tape recorder, intending to obtain a statement from Ronald. Arrasmith described approaching Ronald, who was lying on the ground under a vehicle and saying something to Ronald, who dismissed Arrasmith with a one-line response. According to Arrasmith, Ronald reached for something, which Arrasmith thought was a gun, and then Arrasmith heard shots being fired. These were the shots fired by Arrasmith himself. Arrasmith did not testify that he began shooting in response to any passion aroused by Ronald's comment; rather, he claimed not to remember pulling the trigger at all. As to shooting Luella, Arrasmith claimed that she appeared to be waiting for him to come out of the garage, and he thought he saw a gun when he fired at her. There was no testimony that any quarrel with Luella preceded the shooting. Other evidence at trial revealed the number and the locations of the bullet wounds to Ronald and Luella and that neither victim was armed.

We conclude that there was no evidence to support the giving of a voluntary manslaughter instruction. Therefore, the refusal to instruct the jury that a defendant charged with first degree murder may be found guilty of the lesser offense of voluntary manslaughter, when there is no evidence that would reduce the crime to such lesser offense, was not error. *See State v. Seiber,* 97 Idaho 140, 141, 540 P.2d 802, 803 (1975); *State v. Clokey,* 83 Idaho 322, 332, 364 P.2d 159, 165 (1961).

**F. Post-Trial Motions**

In his post-trial motions, Arrasmith argued that the police had withheld evidence in viola-

---

5. Voluntary manslaughter as defined by I.C. § 18–4006 is the unlawful killing of a human

being, without malice, upon a sudden quarrel or heat of passion.

tion of the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which mandated dismissal of the criminal charges against him in the interest of justice under I.C.R. 48. Alternatively, Arrasmith argued that this evidence which was newly-discovered entitled him to a new trial under I.C.R. 34 and I.C. § 19–2406(7). On appeal, Arrasmith's contention is that the district court applied an incorrect standard of "materiality" in analyzing the significance of the evidence of the two guns found at the scene of the murders, which was not learned of by the defense until after trial.

 The United States Supreme Court held in *Brady* that suppression by the prosecution of evidence favorable to an accused, which has been the subject of a discovery request, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Id.* at 87, 83 S.Ct. at 1196–97. Suppression of evidence, which is both exculpatory and material, amounts to a constitutional violation. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A constitutional error occurs, and the conviction must be set aside, only if the evidence is material in the sense that its suppression undermines the confidence in the outcome of the trial. *Id.* at 678, 105 S.Ct. at 3381.

The testimony of the officers at the hearing on Arrasmith's post-trial motions revealed that a gun was found in the repair shop in a drawer in a workbench located twenty-eight feet from where Luella was shot. The condition of the gun was reported to be extremely dirty, with dust on the trigger, and showing no signs of recently having been fired. A second gun was located under the seat of a car parked outside the shop and was retrieved by the owner, an employee of the shop,[6] a day after the shooting. Neither of these guns was logged into evidence by the investigating police. The existence of these guns at the scene became known to the defense only after trial. Arrasmith argued

that because evidence of the guns had been concealed, he was denied his due process rights and deprived of his ability to effectively argue self-defense.

**1. Motion to dismiss**

 Failure by the state to respond to a specific *Brady* request is properly analyzed as error, although automatic reversal of the defendant's conviction should not follow. *Bagley, supra.* To warrant dismissal rather than a new trial on due process grounds, government conduct must be so grossly shocking and outrageous as to violate the universal sense of justice. *United States v. Green,* 962 F.2d 938, 941 (9th Cir.1992). In · the case of an alleged *Brady* violation, dismissal of an indictment is an appropriate sanction for a constitutional violation only where less drastic alternatives are not available. *United States v. Kearns,* 5 F.3d 1251, 1254 (9th Cir.1993), *citing United States v. Barrera–Moreno,* 951 F.2d 1089, 1093 (9th Cir.1991).

 The district court found that the guns should have been disclosed pursuant to the defense's discovery request and that the state's conduct in withholding that evidence subjected the state to sanctions. Applying the standard set forth for dismissal under I.C.R. 48(a)(2), the district court made the following findings:

> [T]he evidence established beyond a reasonable doubt that Luella was shot in the back as she ran away and fell to the ground. By his own admission Arrasmith, after shooting her husband twenty three times as he lay prone beneath a vehicle, searched the shop to find Luella before first shooting her from the side and then in her back.

Based on its findings, the district court determined that the ends of justice would not be served by a dismissal of the charges in this case, reasoning that a new trial would be a more appropriate remedy, if after a review of the evidence the district court could conclude that the nondisclosure of the guns un-

---

6. The owner of the gun was the son of Nez Perce County Sheriff's Captain Scott Whitcomb who was second in command at the sheriff's office and the first law enforcement officer to arrive at

the scene of the shooting. As a result of this relationship, Arrasmith suggested a conspiracy on the part of the police to protect Captain Whitcomb's son.

dermined confidence in the outcome of the trial. We conclude the district court correctly held that the *Brady* error was not such as would be grounds for dismissal of the action, and did not abuse its discretion in denying Arrasmith's motion to dismiss.

### 2. Motion for new trial

■■■■■ A defendant is entitled to a new trial when the net effect of the evidence withheld by the state raises a reasonable probability that its disclosure would have produced a different result. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The standard for evaluating the value of the withheld evidence is derived from *United States v. Bagley*, *supra*, where the Court indicated:

> [T]he evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383. A different standard of materiality is applied to evaluate newly discovered evidence which provides a separate basis, under I.C.R. 34 and I.C. § 19-2406, for the grant of a new trial. A defendant's motion for new trial on these grounds may be granted if the defendant can demonstrate that the newly discovered evidence is material, not merely cumulative or impeaching, and will probably produce an acquittal. *See State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976).[7]

Arrasmith argues that the district court did not apply the correct standard to evaluate the materiality of the guns as evidence which did not come to light until after trial. He argues that the evidence concerning the guns found in the shop would have made more believable his claim of self-defense and would have seriously undermined not only the credibility of the police officers but also the outcome of the trial. Thus, Arrasmith maintains that the gun evidence is material under a *Bagley* analysis, and that, had the evidence been disclosed to the defense, there was a reasonable probability of a different result at trial.

■■■■■ The district court ruled that the discovery of the guns, which became known to the defense only after trial, did not warrant a new trial. A dusty, holstered, unfired gun in a drawer and a gun in a car in the shop did not support Arrasmith's testimony since the guns were not within the Binghams' reach at the time of the shootings. Moreover, the evidence was that the guns did not belong to either of the Binghams and that the Binghams did not know of the presence of the guns. The gun evidence was neither impeaching nor exculpatory. Accordingly, the evidence fails to satisfy the required elements of *Drapeau*. On that basis, Arrasmith's application for a new trial under I.C. § 19-2406 based on newly discovered evidence was properly denied.

■■■■ The district court then noted in its memorandum opinion that the *Bagley* standard, which is used where evidence has been concealed, imposes a lesser burden on the defendant than does the standard under state law for entitlement to a new trial based upon newly discovered evidence. The district court reasoned that Arrasmith would still be compelled to prove that he had acted with the reasonable belief that either he or someone else was in imminent danger, and correspondingly that the presence of the guns of which he had no knowledge aids his case. The district court concluded that the existence of the guns in the shop did not alter the evidence of any of the elements of murder, did not provide a legal defense to Arrasmith, and did not support his claim of self-defense.

Considering the nondisclosed evidence in the context of the entire record, we conclude that the result would not have been different if this evidence had been timely disclosed.

---

7. A motion for new trial based on newly discovered evidence must satisfy all of the following tests: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) the evidence probably will produce an acquittal; and (4) the failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976).

*See Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381. We conclude that the prosecutor's nondisclosure of the gun evidence, in violation of *Brady,* was properly analyzed by the district court and did not, on due process grounds, demand a new trial. Therefore, we uphold the decision of the district court denying the new trial motion.

## G. Excessive Sentence

Arrasmith was sentenced to a term of life imprisonment with a minimum period of confinement of twenty-five years for the murder of Ronald Bingham. For the murder of Luella Bingham, the district court imposed a fixed life term, according Arrasmith no opportunity for parole. The district court further ordered that the sentences be served concurrently. Arrasmith asserts that his sentence is excessive in light of the law-abiding life he led preceding these offenses and in consideration of the hopelessness inherent in the fixed life term which will keep him from being with his family again.

■■■■■ Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). If the sentence is not illegal, the defendant has the burden to show that it is unreasonable and thus a clear abuse of discretion. *State v. Brown,* 121 Idaho 385, 392–93, 825 P.2d 482, 489–90 (1992); *State v. Broadhead,* 120 Idaho 141, 144–45, 814 P.2d 401, 404–05 (1991). The defendant must show that, in light of the governing criteria, the sentence was excessive under any reasonable view of the facts. *Brown,* 121 Idaho at 393, 825 P.2d at 490; *Broadhead,* 120 Idaho at 143–45, 814 P.2d at 403–05. A term is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. *Broadhead,* 120 Idaho at 145, 814 P.2d at 406. An appellate court will not substitute its view for that of the sentencing judge where reasonable minds may differ. *State v. McAway,* 127 Idaho 54, 896 P.2d 962 (1995).

■■■ The district court studied the presentence report and numerous letters from family, friends and supporters from across the country and heard testimony from Doctor Leonore Walker at the sentencing hearing. The district court considered the sentencing factors of I.C. § 19–2521, although incarceration was the obvious choice in the face of the double homicide. The district court found that Arrasmith presented a danger to society and explained:

> [Y]ou believe that you did nothing wrong. You believe it is you who has been injured; and you're right, it has been you who has been injured. Your daughter has been injured. Other people—other members of your family have been injured. But that injury, be it from a stranger or from a family member or from an old acquaintance, that injury is not sufficient under Idaho law to justify a life sentence, to justify death. And you made that decision yourself. You led this Court to conclude that, in a certain respect, you did it because there was nothing else to be done. *Dr. Walker testified this morning that, given the same set of circumstances, you'd do it again. (Emphasis added.)*

The district court gave weight to the defense's assertions of justification and provocation that the defendant was unable to resist. The district court noted Arrasmith's frustration with the lack of police response to make those responsible for the abuse to his daughter and other young women pay for their wrongdoing. Significant to the district court were admissions from Arrasmith, during his testimony, that he had learned on the day of the shooting that the rape case against the Binghams was going to be turned over to the prosecutor, but he nonetheless proceeded to take the matter into his own hands. Arrasmith also admitted that after shooting Ronald twenty-three times, he searched the shop for Luella before shooting her.

The district court enumerated each of the steps taken by Arrasmith over several days prior to the shootings to underscore the premeditation involved and Arrasmith's lack of

remorse for killing two people whom he had repeatedly referred to as animals and vermin. The district court relied on a number of facts which contradicted Arrasmith's claims that he had approached the Binghams in order to get a statement rather than to shoot them. There was testimony from Robert Warnock that he heard Arrasmith say to Ronald Bingham: "I've got something for you, Ron," just before Warnock heard shots fired. There was testimony from Kyle Richardson recalling that sometime between May 7 and May 17, the day of the shooting, Arrasmith had said he wanted to kill Ronald and Luella but not at their home because he didn't wish harm to come to the Bingham's son or to Luella's mother. Richardson also testified that early on the day of the shooting, he watched Arrasmith tape up and cut holes in a box, which Arrasmith later used to house the Tec-9, and that he heard Arrasmith say as he left Richardson's shop, "It's time."

In examining the forensic evidence, the district court focused on the fact that bullet holes in one of Ronald Bingham's arms were explained as being consistent with Ronald raising his arm in a defensive manner. The district court also recalled that, based upon the angle of entrance and exit wounds, the testimony was that Arrasmith continued to shoot Luella as she fell forward and as she lay on the ground.

Addressing the goals of sentencing, the district court stated:

> Unlike most cases, this is one of those instances where deterrence, I believe, ranges second behind protection of society and above retribution. Idaho statute says, ... imprisonment is required not only to deter the defendant, but also to send a message—and this is one time when Idaho law permits the sending of a message. And that is, the Court has to impose a sentence that tells others that if you engage in this kind of conduct, this is what will happen to you.

Finally, in imposing sentence, the district court reiterated the lesson to be derived by others from the sentence:

> [P]erhaps it can help your children, the best thing you can do when there is frus-

tration and anger and a lack of understanding of everyone around you is to step back. This is not the wild, wild West regardless of what anyone says. We don't make heroes of people who shoot other people. And we wait and give the system a chance. It doesn't always work. Sometimes it works horribly. But as much as I looked for it, as much as I understand, as much as I've almost gone through what you've gone through with a family member, when you asked that question, What would you do, and my response is, Not this.

Having reviewed the evidence which was before the district court, focusing on the nature of the offense and the character of the offender, we cannot say that Arrasmith has successfully shown that his sentence was unreasonable or excessive under any reasonable view of the facts. Given our analysis of the sentencing goals of protection of society, deterrence, rehabilitation and retribution with respect to the facts of this case, we conclude that the district court did not abuse its discretion in ordering Arrasmith to serve a fixed life term of incarceration.

### H. Special Prosecutor

 We summarily dispose of Arrasmith's argument that he was unlawfully prosecuted by one who had no authority. Arrasmith challenges the participation of Michael Kane, who was sworn in as a special deputy by the Nez Perce County Prosecutor in June of 1995 rather than appointed pursuant to I.C. § 31–2603(b). Our Supreme Court has held that in the absence of showing that a defendant was denied a fair trial by reason thereof, the appointment and participation of a special prosecutor is not subject to collateral attack. *State v. Bell*, 84 Idaho 153, 159–60, 370 P.2d 508, 511–12 (1962). We conclude that the required showing has not been made in this case.

## IV.

### CONCLUSION

The judgments of conviction for first degree murder and for second degree murder,

together with the sentences imposed, are affirmed.