7 A.3d 1038

Tony WILLIAMS

v.

STATE of Maryland.

No. 30, Sept. Term, 2009.

Court of Appeals of Maryland.

Oct. 27, 2010.

Reconsideration Denied Dec. 17, 2010.

Daniel H. Ginsbugh and Gary E. Bair (Bennett & Bair, LLC, Greenbelt), on brief, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, GREENE, MURPHY, JOHN C. ELDRIDGE (Retired, specially assigned), LAWRENCE F. RODOWSKY (Retired, specially assigned) and IRMA S. RAKER (Retired, specially assigned), JJ.

RAKER, J.

In this case, we consider whether petitioner was prejudiced by the admission in his second trial of videotaped testimony by a deceased witness despite her statement to the police, unknown to petitioner during his initial trial, that she was "legally blind." We shall hold that the State failed to meet its discovery obligations under the Maryland rules, and that

petitioner was prejudiced when the Circuit Court for Baltimore City received the witness's videotaped previous trial testimony into evidence at his second trial. Accordingly, we shall reverse and remand for a new trial.

I.

This case arises out of the shooting death of petitioner's fiancée, Dana Drake, in Baltimore City sometime around 3:00 a.m. on February 21, 1998. Ms. Drake was shot to death with a .22 caliber gun in a common area of her apartment building, after having returned from a social event at the local Teamsters Union Hall. About ninety minutes after witnesses reported hearing gunshots, petitioner called the police to report Ms. Drake's shooting. Petitioner met Baltimore Police officer Richard Gibson at a payphone, and led him to the murder scene. He told the officer that he and Ms. Drake had been romantically involved, but that she had a new boyfriend, and that he had recently threatened to kill her. Soon after reporting Ms. Drake's death to the police, petitioner came under suspicion for the murder.

On March 16, 1998, the Grand Jury for Baltimore City indicted petitioner for the crimes of first-degree murder, using a handgun in the commission of a crime of violence, and carrying a handgun, in connection with Ms. Drake's death.

Brenda O'Carroll, who lived on the first floor of Ms. Drake's building, was a key prosecution witness at petitioner's 1999 murder trial. At trial, Ms. O'Carroll testified in substance as follows:

[O'Carroll]: I heard what—it sounded like two shots outside my building. Then the front door opened and someone came in and then the door opened upstairs and then the door opened again and somebody was coming downstairs, and then I heard the young man having ,words, but I couldn't make out what either were saying to each other because I was in my hallway area and my bedroom and my living room and dining area is between.

\* \* \*

[Prosecutor]: Now, did you hear the voices before or after the shots?

\*　　\*　　\*

[O'Carroll]: After the first set of shots.

[Prosecutor]: Okay. So you heard shots outside the building area, you said?

[O'Carroll]: Yea.

[Prosecutor]: Then you heard the voices?

[O'Carroll]: Yea.

[Prosecutor]: And then you heard shots from where?

[O'Carroll]: The hallway.

[Prosecutor]: How many did you hear from the hallway?

[O'Carroll]: One, she was knocking on my door. I was in my bedroom and she tapped very, very, very faintly as—almost as if she didn't really want to wake me up but she tapped. I heard her. I live alone and it's quiet in the building and you just hear, you know. I should have opened the door.

[Prosecutor]: Did there come a time when you opened the door?

[O'Carroll]: Yes.

[Prosecutor]: When was that? How long after you heard the last shots did you open the door?

[O'Carroll]: About fifteen minutes, I think.

[Prosecutor]: Okay. And what, if anything, did you see when you opened the door?

[O'Carroll]: She was sitting on the third step from the bottom.

\*　　\*　　\*

[Prosecutor]: Okay. Now after you heard these shots, Ms. O'Carroll—

[O'Carroll]: Yea.

[Prosecutor]:—did you ever see anyone—did you see Mr. Williams any time after that—

[O'Carroll]: Yea.

[Prosecutor]:—after that night? You did?

[O'Carroll]: Uh-huh.

[Prosecutor]: When?

[O'Carroll]: I saw him. He parked his car on the right hand side of—that would be Marjorie, and then he ran—he jumped in his car. He pulled it back onto the parking lot and then he rode out like Speedy Gonzales.

[Prosecutor]: When was this, Ms. O'Carroll?

[O'Carroll]: This is just before I opened the door and saw her on the steps with her head on the side dead. There was blood at my door.

When defense counsel cross-examined Ms. O'Carroll, the following relevant testimony was elicited:

[Defense counsel]: And the one shot that you hear inside of the building, what else do you hear between those shots?

[O'Carroll]: Words.

[Defense counsel]: Okay. And what words did you hear?

[O'Carroll]: I couldn't make out. It was an argument. I didn't—that's what I said. I did not hear the words.

[Defense counsel]: Okay.

[O'Carroll]: Alright. But I looked. His car was parked on the other side of the street at that time.

\* \* \*

[Defense counsel]: Let me ask you this, ma'am, and I really don't mean to be personal.

[O'Carroll]: Uh-huh.

[Defense counsel]: But your left hand—

[O'Carroll]: Yes.

[Defense counsel]:—is swollen?

[O'Carroll]: I have cancer. My breast was removed.

[Defense counsel]: I understand.

[O'Carroll]: And the lymph nodes, so that's fluid. It's bigger than my other hand, yes.

\* \* \*

[Defense counsel]: And you indicated that you told the homicide detectives just what you said here today, is that correct?

[O'Carroll]: No, when I found out that he was for him [sic], I immediately stopped talking, told him to leave my house.

[Defense counsel]: But that was after you told him—"I mean, [I'm] for real, [petitioner] ain't a nice person, and then he got that on him and I hope they just get all of the juice on his ass and go ahead and fry him, that's all"?

[O'Carroll]: Yes, I said that.

[Defense counsel]: You said that?

[O'Carroll]: Yes, I did.

[Defense counsel]: But what I'm talking about is, did you tell the homicide detectives, the Police Department of Baltimore City, did you tell them what you have said here today?

[O'Carroll]: Yea.

[Defense counsel]: And you told them that between the shots, two shots outside, somebody comes, you hear argument, now that is inside the foyer area?

[O'Carroll]: Uh-huh.

[Defense counsel]: Okay. And then you hear somebody go upstairs?

[O'Carroll]: Uh-huh.

[Defense counsel]: Is that right?

[O'Carroll]: She went up.

[Defense counsel]: How do you know she went up?

[O'Carroll]: Because she came in first.

[Defense counsel]: How do you know that, you were in your bedroom?

[O'Carroll]: He shot—she parked her car.

[Defense counsel]: She parked her car?

[O'Carroll]: He saw her. He was right behind her. He pulled his car over on this side. He shot at her going into the house.

\*　　\*　　\*

[Defense counsel]: Okay. Now I'm understanding you. And you see all of this, right?

[O'Carroll]: I heard the shots. I saw the car.

\* \* \*

[Defense counsel]: Now, you saw him get out of the car?

[O'Carroll]: Yea.

[Defense counsel]: And he started chasing her?

[O'Carroll]: Yea.

[Defense counsel]: And then he started shooting?

[O'Carroll]: Yea, two shots.

\* \* \*

[Defense counsel]: Now, you have windows in your bedroom?

[O'Carroll]: Uh-huh, but they would be in the back. But my kitchen can—I can see Marjorie. My bedroom window too, actually. I can see Marjorie, but I get more of a view on Marjorie from my kitchen and my living room windows.

\* \* \*

[Defense counsel]: What did you—after the muffled gunshot, what did you see him do?

[O'Carroll]: He got in his car.

[Defense counsel]: And what does he do?

\* \* \*

[O'Carroll]: He backed out.

[Defense counsel]: Alright.

[O'Carroll]: And he went out on Marjorie Lane.

A second witness, Shannond Fair, was in the vicinity of the shooting and testified at petitioner's 1999 trial. Mr. Fair stated that he lived in an apartment building across the street from the scene of the shooting, and that he heard gunshots, looked out of his second-story window and saw a man, dressed in black, running up Marjorie Lane. He did not observe the man's face, and consequently was unable to identify the suspect precisely.

Also at petitioner's 1999 trial, the State offered evidence that petitioner, while in jail, confessed to having murdered Ms. Drake to Sean Williams (hereinafter "S. Williams"). S. Williams was incarcerated for possession of a controlled dangerous substance, and was housed in a cell adjacent to petitioner's cell. Unbeknownst to petitioner, S. Williams was a police informant. Indeed, for approximately ten years, S. Williams had served as a registered police informant, and had participated in the prosecution of several crimes before petitioner's trial.

At petitioner's 1999 trial, S. Williams testified that petitioner spelled out the details of the crime over two to three days while they were imprisoned together. He testified that petitioner admitted to having taken out a life insurance policy on Ms. Drake, and that he had killed her, because he was "like $100,000 in debt." He said that petitioner told him he had purchased a .22 caliber handgun, and had given it to his cousin for disposal after Ms. Drake's death.

The State did not disclose to the defense before petitioner's first trial that S. Williams was a paid police informant, or that he was seeking a sentence reduction. Although S. Williams's identity as an informant was known to at least one member of the State's Attorney's office, the assistant State's attorney responsible for prosecuting petitioner's case, was not informed. S. Williams represented that in testifying he was acting "out of the goodness of his heart," and because he did not like violence.

In addition to the two crime scene witnesses and the police informant testimony, in petitioner's 1999 trial the State offered evidence as to petitioner's motive to kill Ms. Drake. Prosecutors showed that petitioner had purchased a life insurance policy with a spousal rider, within two years before Ms. Drake's murder. The policy provided that if Ms. Drake were to die, petitioner would receive $100,000 in proceeds. The State also showed that petitioner was over $90,000 in debt. Finally, the State called a gun dealer, Charles Frank, who testified that he had delivered a .22 caliber handgun to peti-

tioner on February 15, 1998, less than a week before Ms. Drake's murder.

The jury convicted petitioner of all three charges on February 10, 1999. The court sentenced him on the murder conviction to a term of incarceration of life, and on the handgun violation, to a term of incarceration of twenty years, to be served consecutively. Petitioner noted a timely appeal to the Court of Special Appeals, which affirmed his conviction in an unreported opinion. *See Williams v. State,* No. 765, Sept. Term, 1999, filed March 23, 2000.

Petitioner filed a petition for post-conviction relief on May 24, 2001, alleging that the State had violated the precepts of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[1] by failing to disclose material impeachment evidence concerning S. Williams. The Circuit Court denied relief, ruling that petitioner's conviction was not obtained in violation of the *Brady* doctrine. In particular, the court explained that it would be improper to impose on the State a duty to disclose information held by State agents who had never participated in the prosecution of the case. The Circuit Court further denied a motion by petitioner to alter or amend the judgment.

Petitioner filed an application for leave to appeal from the denial of post-conviction relief, which the Court of Special Appeals granted.[2] The intermediate appellate court reversed

---

**1.** In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates [the defendant's rights under the Due Process Clause of the federal Constitution, U.S. CONST., amend. XIV] where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97.

**2.** Petitioner presented the following questions before the Court of Special Appeals:

I. Did the circuit court err in absolving the State of any duty to disclose exculpatory impeachment information where police officers and an Assistant State's Attorney knew of the exculpatory impeachment information but did not convey that information to the police officers and prosecutor assigned to prosecute Appellant?

and remanded the case to the Circuit Court for a new trial. *Williams v. State*, 152 Md.App. 200, 831 A.2d 501 (2003). The Court of Special Appeals held that the State violated *Brady* by withholding material information, and in particular, that the fact that S. Williams was a paid police informant and was seeking a sentence reduction should have been disclosed to petitioner. The holding of the Court of Special Appeals can be summarized as follows:

> "[T]here is no question but that [S.] Williams, a key witness at the murder trial, was a paid police informant who had received leniency on criminal offenses because of his status as an informant; wrote approximately nine letters to Judge Schwait looking for a reduction of his sentence because, *inter alia*, he was going to testify in two murder cases for the State; and lied at appellant's trial about his motives for testifying against appellant, who he said, had confessed to him that he had killed his girlfriend. At least one Assistant State's Attorney, Gary Shenker, knew that Williams was a paid police informant who had received not only money, but also, a stet in the case against him for theft of the police cruiser, in exchange for information in various narcotics cases.
>
> \* \* \*
>
> [I]n the present case, Williams's testimony that appellant confessed to the murder of Ms. Drake was the only direct evidence, other than Ms. O'Carroll's apparently confused version of events, linking appellant to the crime. As the post conviction court found, there was no forensic evidence linking appellant to the crime scene and no direct evidence was found linking appellant to the crime as a result of the search of appellant's car or home.
>
> \* \* \*

II. Is there a substantial possibility that the exculpatory impeachment information withheld by the State would, if properly disclosed, have affected the jury's verdict, thus requiring a new trial?

*Williams v. State*, 152 Md.App. at 204, 831 A.2d at 503.

Accordingly, we hold ... 'that the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder conviction that a new trial is in order.' "

*Id.* at 222–27, 831 A.2d at 513–16 (internal citations omitted).

The State filed a Petition for Writ of Certiorari, which this Court granted. *State v. Williams,* 378 Md. 617, 837 A.2d 928 (2003). The primary question presented was whether the State's *Brady* disclosure obligations applied when the exculpatory information in question was known to one prosecutor in the State's Attorney's office, but not to the prosecutor responsible for prosecuting the case. We answered the question in the affirmative. Chief Judge Bell, writing for the Court, explained as follows:

"We hold that by referring only to the 'State's Attorney and staff members,' without any restriction, and then including 'any others,' restricted to those with a direct present or past involvement with the particular action, Rule 4–263(g) [3] draws a distinction between the State's Attorney's Office and those outside that Office who are on the prosecution team. The latter category falls within the *Brady* rule only if those persons have or have had involvement with the action at issue or regularly reports to the State's Attorney's Office. No such limitation applies to the attorneys and staff in that Office. As to them, the *Brady* obligation extends to material and information in their possession. Thus, where, as in the case *sub judice,* the information regarding S. Williams's status as an informant was known to another attorney in the State's Attorney's Office, the Rule compels its disclosure."

*State v. Williams,* 392 Md. 194, 209–10, 896 A.2d 973, 982 (2006). We then reiterated the duty of the State to discover and disclose evidence concerning the credibility of its witnesses, stating as follows:

---

**3.** Rule 4–263 prescribes the discovery obligations of the defendant and the State, and is discussed in greater detail *infra.*

"When the core of the State's argument relies on the testimony of an essential witness, the State has a duty to discover anything, and everything, that concerns that witness's credibility and, thus, potential for impeachment. The State admits that, under *Giglio* [*v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) ], when the reliability of a witness is determinative of guilt or innocence, nondisclosure of such evidence falls within *Brady*. In that case, where the entire State's case relied upon the credibility of the testimony of a key State witness, the Supreme Court held that 'evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility.' 405 U.S. at 154–155, 92 S.Ct. at 766, 31 L.Ed.2d at 108. *See also Ware v. State*, 348 Md. 19, 41, 702 A.2d 699, 710 (1997) ('The prosecutor's duty to disclose applies to any understanding or agreement between the witness and the State')."

*Id.* at 210–11, 896 A.2d at 982. We affirmed the Court of Special Appeals in granting petitioner relief in the form of a new trial.

By the time petitioner's new trial commenced in March, 2007, Brenda O'Carroll had died. Her death took on increased significance because of the revelation, after her death, of statements she had made to the police about her vision and which, petitioner argues, affected her 1999 testimony. Specifically, Baltimore City Detective Darryl Massey disclosed shortly before the second trial, and well after Ms. O'Carroll's death, that she had described herself to him as "legally blind" during the course of the investigation leading up to petitioner's 1999 trial.

Ms. O'Carroll's statement emerged for the first time on February 22, 2007, at a pretrial hearing in connection with petitioner's second trial in which petitioner had moved to suppress statements by petitioner to S. Williams.[4] At the hearing, Det. Massey testified as follows:

---

**4.** Petitioner moved to suppress evidence seized from his car and his apartment pursuant to a search warrant and to suppress his post-arrest

[Prosecutor]: And did [Ms. O'Carroll] give a description of anyone?

Det. Massey: No, sir.

[Prosecutor]: Okay. Did she say that she saw anyone running, like at the scene?

Det. Massey: She mentioned hearing, hearing things. Part of her sickness, she was blind, whether it was legally, or— she was blind.

\* \* \*

[Defense Counsel]: If you remember before we broke up for lunch, you testified both on direct and on cross, in regards to Brenda O'[Carroll], that she gave no description of anyone and then you said the witness was blind. Do you remember that?

Det. Massey: Yes, sir.

[Defense Counsel]: Did you base your conclusion that the witness was blind based on something that she told you or your observation of her when you interviewed her?

Det. Massey: Both.

[Defense Counsel]: Both?

Det. Massey: Yes, sir.

[Defense Counsel]: So she told you she was blind—

Det. Massey: Legally. Yes, sir.

[Defense Counsel]: —and she looked blind?

Det. Massey: Her demeanor was consistent with someone who may have a sight imparity, sure.

Petitioner moved to exclude O'Carroll's videotaped testimony from evidence in his second trial. The Circuit Court ruled as follows:

"While I'm going to deny the relief that you've requested, I am going to grant you some relief, and that is this. I watched her testimony and there's really no evidence on the

---

written statement. Petitioner did not appeal from the resolution of any of these motions, nor are they raised by either party in the Petition for Certiorari. Accordingly, these issues are not before us.

tape that she suffers from any disability and she makes statements about things that she sees that are accurate, such as the color and model of the car and that sort of thing. So one wonders if she was actually disabled visually, how she'd be able to do that ... Whether there's an issue of her vision was only introduced much later by Detective Massey in these proceedings. I think that I'm going to permit [defense counsel] to question him about that and I'm going to allow as an exception under the residual exception provisions of Maryland Rule 5–803 as hearsay. If [defense counsel] wants to supplement that record in any way, he's able to get ahold of medical records or anything else, I'll allow that in as part of the record and I'll allow him to argue to the jury that they have to consider her observations in light of whatever evidence he can establish that she had impaired vision. But, I'm not prepared to exclude her testimony, because I don't think the record establishes what the extent of her vision was. I don't think that being legally blind means that you're entirely blind, I think it means you meet some minimal standard of impairment that may allow you to have benefits. But none of us have in the record before us any evidence as to what that standard is, and I'm not prepared to exclude her testimony or redact."

The Court went on to admonish the State for its nondisclosure, stating:

"I'm not happy about what happened here. I happen to be of the view that *Brady* extends the obligation to all the agents of the State ... I don't know why any police officer, if he had information that an eyewitness was blind, wouldn't bring it immediately to the attention of everybody...."

While the court viewed the State as culpable for the untimely disclosure of Ms. O'Carroll's statements, the court crafted a remedy short of excluding her testimony. The court explained as follows:

"[Defense Counsel] had pressed the court ... concerning Detective Massey's testimony that Ms. O'Carroll suffered from legal blindness for a finding with respect to whether or not it constituted a *Brady* violation or discovery violation

under the Maryland rules and I want to put the following on record: The court finds that technically Detective Massey's failure to advise anyone of Ms. O'Carroll's statement concerning her legal blindness must be charged to the State because he is an agent of the State and it is the State's responsibility to make inquiry of its agents of matters going to the defendant's guilt or punishment, and this includes impeachment of the State's witnesses.

\* \* \*

The court in response to defendant's Motion for Appropriate Relief has fashioned what it believes to be appropriate relief under the difficult circumstances that the witness in question has died before she could be examined concerning her vision impairments. . . . Under the court's ruling he will be permitted to put the issue before the jury and allow them to assess Ms. O'Carroll's testimony in light of her demeanor on the stand and this out-of-court remark about her visual limitations."

In accordance with its ruling, the trial court permitted the State to play the entire videotaped testimony of Ms. O'Carroll from petitioner's first trial.

On April 2, 2007, petitioner was convicted again of first-degree murder, use of a handgun in commission of a crime of violence, and carrying a handgun in connection with the death of Ms. Drake. The Circuit Court sentenced him on the murder conviction to a term of incarceration of life imprisonment, and five years, consecutive, on the handgun violations.

Petitioner noted a timely appeal to the Court of Special Appeals, arguing that the Circuit Court erred in admitting a videotape of the testimony of Brenda O'Carroll.[5] *Williams v. State*, 183 Md.App. 517, 962 A.2d 440 (2008).

---

**5.** Petitioner presented the following questions before the Court of Special Appeals:

> I. Did the circuit court err by not dismissing appellant's indictment with prejudice, given the prosecution's repeated *Brady* violations in this case?

The intermediate appellate court affirmed petitioner's second conviction, holding that even if the State's failure to disclose Ms. O'Carroll's visual impairment could be characterized initially as *Brady* information, the information had been disclosed to petitioner over one month before the second trial, and therefore, any *Brady* violation had been cured. *Williams,* 183 Md.App. at 527, 962 A.2d at 445. The Court stated as follows:

> "Ms. O'Carroll's assertion that she was 'legally blind' was not kept 'hidden' but was actually disclosed by Detective Sergeant Massey well in advance of appellant's second trial. Consequently, although the concealment of that evidence was arguably a *Brady* violation at the time of the first trial, it was no longer a *Brady* issue at the time of the second. In short, the *Brady* problem as to this piece of evidence was resolved by the granting of the second trial."

*Id.* at 526, 962 A.2d at 445.

The court then analyzed the use of Ms. O'Carroll's testimony under the rules governing the admissibility of prior recorded testimony prescribed in Maryland Rule 5–804(b)(1).[6] The court noted the Rule's precept that former testimony is not

---

II. Did the circuit court err in admitting a videotape of the prior testimony of Brenda O'Carroll, a key State's witness who died before appellant's second trial, where the prosecution withheld evidence that O'Carroll was legally blind?

III. Did the circuit court err in denying appellant's motion to suppress statements that he allegedly made to informant Sean Williams while they were jailed together, where the informant secretly interrogated appellant about the decedent's murder and tried to use his cooperation with the police in order to obtain a lower sentence?

IV. Did the circuit court err by failing to strike the testimony of a homicide detective who opined that the evidence established appellant's guilt beyond a reasonable doubt?

*Williams v. State,* 183 Md.App. at 522, 962 A.2d at 442–43.

**6.** Md. Rule 5–804(b)(1), Former testimony, provides as follows:

"Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

excluded by the hearsay rule if the declarant is unavailable as a witness, so long as the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony on cross-examination. *Id.* at 528, 962 A.2d at 446. The court held that the testimony was admitted properly under Rule 5–804(b)(1). *See id.* at 533, 962 A.2d at 449. The court described its rationale as follows:

"At his first trial, appellant had good reason to question Ms. O'Carroll about her eyesight, given that, as Shannond Fair put it, it was "pitch dark" outside at the time of the murder and Ms. O'Carroll's complicated health history. As to that history, the defense was alerted early on that O'Carroll had significant medical problems.

\* \* \*

[T]hat appellant's counsel chose not to question her at all about her eyesight does not alter the fact that he had a motive to do so."

*Id.* at 530–31, 962 A.2d at 447.

Petitioner filed a Petition for Writ of Certiorari with this Court, presenting the following questions:

"1. Did the trial court err in admitting the prior testimony of Brenda O'Carroll, the State's key eyewitness who died before Petitioner's second trial, where the prosecution withheld evidence that O'Carroll was 'legally blind,' thereby denying Petitioner a fair opportunity to cross-examine her, in violation of the Confrontation Clause?

2. Given the prosecution's multiple *Brady* violations that severely and irreparably prejudiced Petitioner, did the trial court err by refusing to dismiss his indictment with prejudice?"

We granted Certiorari to consider the above issues. *Williams v. State*, 408 Md. 149, 968 A.2d 1064 (2009).

## II.

This case involves several Maryland rules, evidentiary considerations and constitutional issues. The rules implicated in

this case are Maryland Rules 4–263 [7] and Rule 5–804(b)(1). Petitioner's arguments implicate also the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

---

7. Md. Rule 4–263(d), in pertinent part, requires that the State's Attorney, without the necessity of a request, shall provide to the defense:

(5) Exculpatory Information. All material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged;

(6) Impeachment Information. All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:

&ast; &ast; &ast;

(E) a medical or psychiatric condition or addiction of the witness that may impair the witness's ability to testify truthfully or accurately, but the State's Attorney is not required to inquire into a witness's medical, psychiatric, or addiction history or status unless the State's Attorney has information that reasonably would lead to a belief that an inquiry would result in discovering a condition that may impair the witness's ability to testify truthfully or accurately.

(7) Searches, Seizures, Surveillance, and Pretrial Identification. All relevant material or information regarding:

(A) specific searches and seizures, eavesdropping, and electronic surveillance including wiretaps; and;

(B) pretrial identification of the defendant by a State's witness.

(e) Disclosure by Defense. Without the necessity of a request, the defense shall provide to the State's Attorney:

&ast; &ast; &ast;

(h) Time for Discovery. Unless the court orders otherwise:

(1) the State's Attorney shall make disclosure pursuant to section (d) of this Rule within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213, and;

(2) the defense shall make disclosure pursuant to section (e) of this Rule no later than 30 days before the first scheduled trial date.

&ast; &ast; &ast;

(n) Sanctions. If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this Rule, the court may order that party to permit the discovery of the matters not previously disclosed, strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, prohibit the party from introducing in evidence the matter not disclosed, grant a mistrial, or enter any other order appropriate under the circumstances. The failure of a party to comply with a discovery obligation in this Rule does not automatically disqualify a witness from testifying. If a motion is filed to disqualify the witness's testimony, disqualification is within the discretion of the court.

Petitioner raises two issues in this appeal. First, he argues that the trial court erred in admitting the prior testimony of Ms. O'Carroll and thereby denied him a fair opportunity to cross-examine her, in violation of the Confrontation Clause to the United States Constitution. Second, he maintains that given the State's multiple *Brady* violations, (the first being the information regarding the jailhouse informant, and the second being the failure to disclose Ms. O'Carroll's statement about her eyesight), that the trial court erred by refusing to dismiss the indictment with prejudice.

Overarching the State's responses to all of petitioner's arguments is the State's position that there was no *Brady* violation in this second trial because the State made petitioner aware of O'Carroll's statements before the second trial. As a fall back argument, the State asserts that even if this Court finds a *Brady* violation, the Circuit Court exercised its discretion properly in fashioning a remedy that did not exclude O'Carroll's testimony at the second trial. Relying on *Evans v. State*, 304 Md. 487, 500, 499 A.2d 1261, 1268 (1985), the State points out that "[t]he question of whether any sanction is to be imposed for a discovery violation, and if so what sanction, is in the first instance committed to the discretion of the trial judge, and . . . the exercise of that discretion includes evaluating whether the violation prejudiced the defendant." Finally, as to the *Brady* violation issue, the State argues that the court exercised its discretion properly in denying petitioner's motion to dismiss the indictment as a sanction for "multiple" *Brady* violations.

As to petitioner's confrontation argument, the State maintains that the trial court did not err in permitting O'Carroll's prior recorded testimony to be played in its entirety to the jury at the second trial because petitioner had both an opportunity and similar motive to fully cross-examine Ms. O'Carroll at the first trial, and hence, the admission of the evidence at the second trial did not violate his right to confrontation.

### III.

█ We address first petitioner's argument that the State's conduct in failing to disclose Ms. O'Carroll's statement before the first trial constituted a *Brady* violation and that the trial court erred in failing to dismiss the indictment with prejudice. The trial judge seemed to find, implicitly, that there was a *Brady* violation, although he did not say so explicitly.

This case and the *Brady* issue come before this Court in an unusual posture, because it may well be that the State's failure before the first trial to tell petitioner that Ms. O'Carroll told the detective she was legally blind may have violated the precepts of *Brady*. Significantly, however, the State *did* tell petitioner this information *before the second trial* and therefore, petitioner was aware of the witness's statements.

█ It is beyond cavil that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Diallo v. State,* 413 Md. 678, 704, 994 A.2d 820, 835 (2010). The cases are legion, however, that "[e]vidence *known to the defendant* or his counsel, that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady* [.]" *State v. Rasmussen,* 225 Conn. 55, 621 A.2d 728, 747 (1993); *see also United States v. Presser,* 844 F.2d 1275, 1283 (6th Cir.1988) (stating that "[s]o long as a defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated."); *United States v. Vap,* 852 F.2d 1249, 1256 (10th Cir.1988) (stating that "*Brady* is not violated when the *Brady* material is available to [a defendant] during trial."). Thus, *Brady* offers no relief when the defendant knew of the facts before trial. *Yearby v. State,* 414 Md. 708, 724, 997 A.2d 144, 153 (2010) (stating "[i]f the defendant has actual or constructive knowledge of the allegedly withheld exculpatory information, there cannot be a *Brady* violation.").

■ In *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999), the United States Supreme Court discussed the confusion that has developed around the characterization of *Brady* materials, explaining as follows:

> "Thus the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material'—although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

In order to establish a *Brady* violation, petitioner must prove that the State suppressed favorable evidence. Here, the videotapes were disclosed before the second trial, and hence, for purposes of this second trial, the evidence is considered not to have been suppressed, even though it should have been given to petitioner earlier. *See, e.g., Bielanski v. County of Kane,* 550 F.3d 632, 645 (7th Cir.2008) (stating that "*Brady* evidence can be handed over on the eve of trial or even during trial so long as the defendant is able to use it to his or her advantage[, although] purposely withholding exculpatory or impeaching evidence until the last moment would be a risky and ethically questionable practice for government agents to undertake ...."); *United States v. Bencs,* 28 F.3d 555, 560 (6th Cir.1994) (stating that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose."); *United States v. Baxter,* 492 F.2d 150, 174 (9th Cir.1973) (stating that "there was no complete suppression" where favorable evidence was disclosed untimely); *White v. State,* 816 A.2d 776, 778 (Del.2003) (finding no *Brady* violation where materials were disclosed a week prior to the trial, and "[d]efense counsel ... neither asked for

a continuance nor objected at trial."); *State v. Daniels,* 13 Conn.App. 133, 534 A.2d 1253, 1255 (1987) (holding that there was no suppression for *Brady* purposes where the defendant elicited the exculpatory evidence by cross-examining a State's witness). In the case *sub judice,* there was no *Brady* violation. Because there was no *Brady* violation, petitioner's argument that the trial court erred in failing to dismiss the indictment because of multiple *Brady* violation fails.[8]

■ There is no question here, however, that there was a "late disclosure" of the O'Carroll information. There was certainly a violation of the discovery rules and obligations upon the State, which according to petitioner, prejudiced him because he did not have the information when he cross-examined Ms. O'Carroll and the trial court then admitted the videotaped testimony in its entirety.

■ The State has the obligation, under the Maryland Rules, as well as the Constitution, without any request by the defense, to provide to the defense all exculpatory material which would negate the defendant's guilt or punishment as to the offense charged. Md. Rule 4–263 requires the State to disclose *Brady* information as part of discovery. *See Yearby v. State,* 414 Md. at 720 n. 8, 997 A.2d at 151 n. 8 (stating that "Rule 4–263 thus govern[s] all disclosure of evidence by the State to a criminal defendant in the circuit courts, including that mandated by *Brady,* as well as that mandated only by rule."). At the time of petitioner's trial, Rule 4–263 stated as follows:

(a) Disclosure without request. Without the necessity of a request, the State's Attorney shall furnish to the defendant:

---

**8.** Even had there been a *Brady* violation in this second case, dismissal of an indictment as a sanction is appropriate only where less drastic alternatives are not available. *See e.g., Gov't of the Virgin Islands v. Fahie,* 419 F.3d 249, 254–55 (3d Cir.2005); *United States v. Kearns,* 5 F.3d 1251, 1254 (9th Cir.1993); *State v. Arrasmith,* 132 Idaho 33, 966 P.2d 33, 45 (App.1998).

(1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged;

(2) Any relevant material or information regarding: (A) specific searches and seizures, wire taps or eavesdropping, (B) the acquisition of statements made by the defendant to a State agent that the State intends to use at a hearing or trial, and (C) pretrial identification of the defendant by a witness for the State.

The Rule required disclosure of the covered information within twenty-five days after the earlier appearance of counsel or defendant's first appearance before the court pursuant to Rule 4–213. Md. Rule 4–263(e).

As to petitioner's 1999 trial, Ms. O'Carroll's statement was never disclosed before or during the proceedings. Petitioner's *Brady* argument in this context would have been well taken. As to petitioner's second trial, defense counsel entered his appearance on August 23 of 2006; the information at issue was not disclosed until February 22, 2007. This far exceeded the 25–day period prescribed in the Rule. As the trial judge noted correctly, this delay in disclosing the information, even though known only to the police detective and not to the State's Attorney, is charged properly to the State.[9] *See* Rule 4–263(g). Thus, to the extent that the State was required to disclose Ms. O'Carroll's statement to Det. Massey, the State violated its discovery obligation.

Rule 4–263(a) required that the State disclose any material or information tending to negate or mitigate the guilt of the defendant. Ms. O'Carroll's statement falls into the category of information tending to negate the guilt of the defendant and

---

**9.** Rule 4–263(g) addresses the discovery obligations of the State's Attorney. The Rule provides as follows:

"The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney."

therefore was included among the State's required disclosures. This Court has emphasized that as to the State's disclosure obligations "[t]here is no distinction between exculpatory evidence and impeachment evidence." *Ware v. State,* 348 Md. 19, 37, 702 A.2d 699, 708 (1997), *citing United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). In *Henry v. State,* 324 Md. 204, 234, 596 A.2d 1024, 1039 (1991), construing the version of Rule 4–263(a) applicable to petitioner's case, we noted that "[c]learly, if the witness had made prior inconsistent statements to the police and the State's Attorney had been aware of it, an obligation to produce this information may have existed." *See also Bruce v. State,* 318 Md. 706, 725, 569 A.2d 1254, 1264 (1990) (stating that "if the State is aware of prior inconsistent statements made by a witness to a police officer, it may have an obligation to produce this information under the duty to furnish exculpatory evidence. Maryland Rule 4–263(a)(1).").

The State's hurdle has not been fully satisfied with a resolution of the *Brady* issue, or the discovery issue. Because Ms. O'Carroll was deceased at the time of the second trial, the videotape of her former testimony was hearsay. Petitioner argues that her testimony should not have been admitted into evidence as violative of his rights under the Sixth Amendment to the United States Constitution and Maryland rules.

 We do not address petitioner's constitutional argument because we can resolve this case on Maryland evidentiary grounds. This Court ordinarily adheres to the principle that a constitutional issue should not be decided where the case can be disposed of properly on other grounds. *See Myer v. State,* 403 Md. 463, 475, 943 A.2d 615, 621–22 (2008); *Smith v. State,* 399 Md. 565, 570 n. 4, 924 A.2d 1175, 1178 (2007); *McCarter v. State,* 363 Md. 705, 712, 770 A.2d 195, 199 (2001). So strong is the interest in avoiding the unnecessary determination of constitutional questions that it "constitute[s] one of the few exceptions to the general rule that an issue must be raised in the petition for certiorari, cross-petition, or Order of the Court." *Myer,* 403 Md. at 475, 943 A.2d at 622.

Two questions arise: Because Ms. O'Carroll is unavailable to testify, is the evidence or any part of it admissible because it is hearsay, and, even if it is, what is the appropriate sanction for a discovery violation?

Maryland Rule 5–801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 5–802 provides that "[e]xcept as otherwise provided . . . hearsay is not admissible." The Rules provide exceptions to this blanket hearsay prohibition, allowing the admission of hearsay under prescribed circumstances. One such exception is for former testimony. *See* Rule 5–804(b)(1). The Rule provides as follows:

"Testimony given as a witness in any action or proceeding [is admissible despite the Rule 5–802 prohibition on hearsay] if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

The State argues that Ms. O'Carroll's testimony was admissible as an exception to the prohibition against hearsay because it was prior recorded testimony, received at an occasion where petitioner had the opportunity and similar motive to cross-examine her at the first trial.

As set forth in Rule 5–804(b)(1), the requirement that a party have had an opportunity to develop the testimony "is generally satisfied when the defense [was] given a full and fair opportunity to probe and expose [the] infirmities [of the testimony] through cross-examination." *United States v. Salim*, 855 F.2d 944, 954 (2d Cir.1988) (internal quotation and citation omitted). A motive to develop testimony is sufficiently similar for purposes of Rule 804(b)(1) when the party now opposing the testimony would have had, at the time the testimony was given, "an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue" now before the court. *United States v. Carneglia*, 256 F.R.D. 366, quoting *United States v. DiNapoli*, 8 F.3d 909, 914–15 (2d Cir.1993). Professors Stephen A.

Saltzburg, Daniel J. Capra, and Michael M. Martin, the Commentary to Federal Rule of Evidence 804,[10] explains similar motive to develop testimony as follows:

"Such testimony is defined as that given by a witness at another hearing of the same or a different proceeding, or during the taking of a deposition, under circumstances such that the party against whom the testimony is now offered (or that party's predecessor in interest in a civil case) had an opportunity and similar motive to that which would exist at the time the testimony is offered, to develop testimony.

The touchstone of admissibility is a similar motive to develop the testimony on the part of the nonoffering party (or a predecessor in interest in a civil case). The way to determine whether or not motives are similar is to look at the issues and the context in which the opportunity for examination previously arose, and compare that to the issues and context in which the testimony is currently proffered. The similar motive inquiry is essentially a hypothetical one: is the motive to develop the testimony at the prior time similar to the motive that would exist if the declarant were produced (which of course he is not) at the current trial or hearing?"

We hold that although petitioner may have had an opportunity to cross-examine Ms. O'Carroll at the first trial, it was not an adequate one, because he had not been informed that Ms. O'Carroll was "legally blind," or at least considered herself to be so. As such, we cannot say that her testimony with regard to what she said she saw was reliable.[11] Although

---

10. Md. Rule 5–804(b)(1) "mirrors the language of Federal Rule of Evidence 804(b)(1)." *United States Gypsum Co. v. Mayor of Baltimore,* 336 Md. 145, 180 n. 14, 647 A.2d 405, 422 (1994).

11. Even if the State were to establish that the testimony fits within the hearsay exception of former testimony, the testimony is not automatically admissible. After the trial court finds by a preponderance of the evidence that the hearsay statement is admissible under Maryland Rule 5–804(b)(1), it must then perform the balancing test required under Maryland Rule 5–403. The trial court retains discretion to exclude admissible hearsay evidence. Under Rule 5–403, the court may exclude

petitioner had the incentive to question the witness' perception, without knowing her statement to the detective, he would have had no reason to believe that she was "legally blind."

 In the alternative, the State argues that even though the trial court found that the State failed to timely disclose the "legally blind" statement to petitioner, the trial court fashioned an appropriate remedy for the untimely disclosure.

 The decision as to which remedy or sanction to impose generally rests within the broad discretion of the trial court. *See Thomas v. State,* 397 Md. 557, 570, 919 A.2d 49, 57 (2007). At the time of petitioner's second trial, the discovery rule governing criminal cases, Rule 4–263(i), provided as follows, in relevant part:

> "If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this Rule, the court may ... strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, ... grant a mistrial, or enter any other order appropriate under the circumstances."

Ordinarily, a court will "impose the least severe sanction that is consistent with the purpose of the discovery rules." *Thomas,* 397 Md. at 571, 919 A.2d at 58. This Court has explained that in remedying a discovery violation, the court should weigh (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice ...; and (4) any other relevant circumstances." *Id.* at 570–71, 919 A.2d at 57–58; *see also Taliaferro v. State,* 295 Md. 376, 390–91, 456 A.2d

evidence that has "probative value ... substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 5–403 requires the court to assess the "probative value of the proffered item as well as the harmful consequences that might flow from its admission." Here, inasmuch as the untimely disclosure of the information deprived petitioner of the opportunity to explore the statement and the information directly with Ms. O'Carroll, petitioner was unfairly prejudiced.

29, 37 (1983) (enumerating similar factors and stating that the factors "do not lend themselves to a compartmental analysis").

We hold that the remedy that Circuit Court devised at petitioner's second trial was inadequate to mitigate the prejudice arising from Det. Massey's nondisclosure of Ms. O'Carroll's vision issues, and constituted an abuse of discretion. We focus on the existence of prejudice and the feasibility of curing the prejudice.

Petitioner was prejudiced significantly by the State's nondisclosure of Ms. O'Carroll's statements about her vision, and he was prejudiced equally in his second trial when her recorded testimony was played for the jury. Ms. O'Carroll was the sole eyewitness identifying petitioner as Ms. Drake's shooter. She testified at petitioner's first trial to seeing petitioner chase Ms. Drake into her apartment building, fire a gun at her, and drive off in his car. Petitioner was deprived of the opportunity to cross-examine the only eyewitness identifying him about the quality of her vision, inquiring into what she meant when she described herself as "legally blind."

In sum, even though there is no evidence of bad faith on the part of the State, the State did not comply with its discovery obligations under Rule 4–263 when it failed to apprise petitioner of Ms. O'Carroll's statement to Det. Massey drawing into question her visual acuity, because this significant information tended "to negate or mitigate the guilt . . . of the defendant as to the offense charged." Petitioner was prejudiced at his second trial when O'Carroll's videotaped testimony was allowed into evidence without restriction. The Circuit Court's remedy of allowing the introduction of any available medical records as well as Det. Massey's testimony about her vision, was inadequate to mitigate the prejudice petitioner suffered at his second trial. On remand, if the State wishes to introduce portions of the previously recorded testimony, the trial court should redact any portion which relates to what she might have seen or testimony dependent upon her vision.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT***

*WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR FUR-THER PROCEEDINGS CONSISTENT WITH THIS OPIN-ION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*

MURPHY and RODOWSKY, JJ., dissent.

MURPHY, J., dissenting, which RODOWSKY, J., joins.

I agree with the majority that, because of the State's failure to disclose Ms. O'Carroll's statement that she was "legally blind," petitioner was denied an adequate opportunity to cross-examine Ms. O'Carroll about her "vision issues" at the first trial. I also agree with the majority that the "abuse of discretion" standard of review is applicable to the issue of whether "the remedy that the Circuit Court devised at peti-tioner's second trial was inadequate to mitigate the prejudice arising from Det. Massey's nondisclosure of Ms. O'Carroll's vision issues, and constituted an abuse of discretion." I dissent, however, from the holding that "[t]he Circuit Court's remedy of allowing the introduction of any available medical records as well as Det. Massey's testimony about [Ms. O'Car-roll's] vision, was inadequate to mitigate the prejudice peti-tioner suffered at his second trial."

In *Gray v. State,* 388 Md. 366, 879 A.2d 1064 (2005), this Court stated:

We will only reverse a trial court's discretionary act if we find that the court has abused its discretion. As noted by this Court in *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005):

" 'Abuse of discretion' is one of those very general, amor-phous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.

The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of 'untenable grounds,' 'violative of fact and logic,' and 'against the logic and effect of facts and inferences before the court.'" *Dehn v. Edgecombe,* 389 [384] Md. at 628, 865 A.2d at 616 (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–1032 (1994).

*Id.* at 383–84, 879 A.2d at 1073–74.

From my review of the record, I am persuaded that the relief fashioned by the Circuit Court—that petitioner would be permitted to attack the credibility of Ms. O'Carroll by presenting the evidence that should have been disclosed prior to petitioner's first trial—does not come close to constituting an abuse of discretion as that term has been defined by this Court. For me, the following portions of the record are of dispositive consequence to the issue of whether petitioner had a full and fair opportunity to impeach Ms. O'Carroll at the second trial.

The opening statement of petitioner's trial counsel included the following comments about Ms. O'Carroll:

Now, when you hear the testimony of Brenda O'Carroll, the direct and the cross-examination, listen carefully because it will be internally inconsistent. At the very end of her direct examination, and not until that point, and watch it carefully as to whether or not even the Prosecutor seemed surprised, she says that she saw Mr. Williams running from the scene and jumping into a red Corvette right after the last shot was fired. She also testifies inexplicably, that the car was parked on Marjorie Lane, that the man that did the shooting was chasing Dana Drake and fired two shots. And that after everything was over, the man had left the scene

that she said was Tony Williams, got into a parked car of the parking lot of the apartment complex, not on Marjorie Lane. Which you would infer means that somehow magically, whoever did this shooting, moved a car during a three to five minute event. Couldn't happen I submit to you.

What else did she say that won't add up? She was interviewed after this incident by an investigator for a previous defense attorney in this case. And she told him flat out, this was [a] month later, that she saw nobody leave the scene, nobody. **She also told Detective Massey, the evidence will show, and he will testify in this case, that she said in an interview on the day of the shooting that she was legally blind. And Detective Massey will also testify that he surmised as much from her mannerisms. That never came out on the prior testimony. You will not hear that on either direct examination in the previous proceeding.**

The evidence will show that Brenda [O'Carroll] never told Detective Massey who will testify, any law enforcement official on the date of the incident, that she saw Tony Williams either during the incident or leaving the scene. Magically one year later, after all of these statements were she never identified anybody, she magically appears in Court and testifies on direct examination that she saw Tony Williams running from the scene and jump into a red Corvette in the parking lot. I ask you to use your commonsense, just like the State stressed. Would a person's memory be better the day of the incident when she's interviewed by a police officer or a year later at the time of trial?

(Emphasis supplied).

The State's case-in-chief included the testimony of Det. Massey. The following transpired during his cross-examination:

Q: Now you remember testifying about a month ago correct?

A: Yes sir.

Q: And you were asked questions in regards to Brenda O'Carroll.

A: Yes Sir. O'Carroll.

Q: And you were asked questions in regards to what information she provided you in connection with this case correct?

A: That's correct.

Q: And according to my discovery you saw her for the first time the day after the shooting with Det. Offer is that correct?

A: The day after or the same day of the incident. The day of the incident would've been meaning the morning as the sun comes up so within that 24 hours of the incident yes.

Q: And you testified at the hearing the month ago didn't you? In fact it was on direct examination by [the prosecutor].

A: Um-hum.

Q: "Question: And did she give a description of anyone?
 "Answer: No Sir."

[Q]: Is that correct?

A: That's correct

Q: Question by [the prosecutor],
 "Question: Okay did she say that she saw anyone running like that at the scene?
 "Answer: She mentioned hearing things. Part of her sickness she was blind. Whether it was legally she was blind."
 Correct. That was your answer

A: From What I believe yes sir. Sure.

Q: **Then later on cross by me,**
 **"Question: All right, And she said[,] you testified . . . that she did not give you a description of anyone right?**
 **"Answer: That's correct.**
 **"Question: And that she was blind.**

"Answer: I believe so, yes sir.

"Question: So she never told you it was not her that told you that it was a black male with dark clothing.

"Answer: No sir."

Then after lunch I asked you this question this other day,

"Question: If you remember before we broke up for lunch you testified both on direct and on cross in regards to Brenda [O'Carroll] that she gave no description of anyone. And then you said that the witness was blind. Do you remember that?

"Answer: Yes Sir.

Your answer. Then I asked,

"Question: Did you base your conclusion that the witness was blind based on something she told you or your observations of you when you interviewed her.

"Answer: Both.

"Question: Both.

"Answer: Both yes sir.

"Question: So she told you she was blind.

"Answer: Legally yes sir.

"Question: And she looked blind.

"Answer: Her demeanor was consistent with someone who may have a sight impairidy [sic]. Sure.

[Q]: Now your testimony would be the same today wouldn't it?

A: And it has been.

Q: Right.

A: Yes Sir.

(Emphasis supplied).

The closing argument of petitioner's trial counsel included the following assertions:

Now, let's get to the heart of their case. Which they studiously stayed away from in their Closing Argument, in their opening remarks. Brenda [O'Carroll] and Shaw

Williams. First, Brenda [O'Carroll]. As it now turns out, based on Michael Morgan, Detective Massey, Detective Harrant, she saw nothing of relevance on the morning of February 21, 1998. And she may have heard something, but we now know that her testimony at both the first trial and her videotaped testimony that you saw is wrong, simply not correct. Why? **Anything she claimed at trial she saw is contradicted by her physical condition, legally blind, and the fact that she never admitted it to either Massey, Harrant, or Defense investigator Morgan.** That she saw the Defendant that morning run out, or in the apartment, or drive away in a red Corvette.

There's something else then that's important. Which is the bias that she had against Tony Williams. You take a look at her testimony and her statement, what did she say? She admitted to Mr. Morgan that everything she said about the Defendant was a hunch or a gut feeling. That's what she though[t], hunch or a gut feeling. You heard the words from her on cross examination by Mr. Brown; I hope that man fries. Was actually this; I hope they just all get all the juice on his ass and go ahead and fry him, that's all.

And of course if the Defendant was guilty of domestic abuse on Dana Drake as is the inference from her statements and her testimony on the videotape, why was Dana Drake still engaged to the Defendant on February 21? Huh? If he was beating on her regularly. On to of that, no evidence of any domestic complaints to the police introduced by the State in this case of Tony Williams against Dana Drake. Second, her testimony as to the shot pattern and the sequence makes no sense at all and is contradicted by Shannond Fair. She says two shots followed by 10 minutes and one shot. According to her testimony, the killer would hang around 10 minutes after two shots were fired almost guaranteeing he might get caught? And then fire one more shot makes no sense at all. Her testimony at trial, after him running out the front door and jumping into a red Corvette. That assume that if it was Tony Williams, that he would be stupid enough, be wrapped of any intelligence,

that he would park his red Corvette in the handicapped block or in the parking lot and commit the crime and run right out and do it. But of course, which is contradicted by her own testimony isn't it, do you remember what she said on the tape? Which is physically impossible. He's running, chasing her, she sees the car over on Marjorie Lane, she hears voices and argument, she then hears a shot, she then sees the Defendant leave and he ran out and jumped into a car in the parking lot. So that somehow during this argument and during this shooting the Defendant moved his car? It doesn't add up. And of course all of that is flatly contradicted by Shannond Fair.

She contradicted herself on direct at trial. This is on Direct. Unfortunately [the attorney representing petitioner in the first trial] didn't pick up on it. On direct she said, page 211, 2/3/99, question, this is by [ ] the prosecutor; did you see anyone in the hallway that evening or that early morning hours other than Ms. Drake? Answer; no. This directly contradicts what she later testified that she saw the Defendant leave the building, jump into the red Corvette and leave. She also said that she saw, or heard, two shots while the Defendant was chasing her, and then one shot later. Now, if that's the case, why wouldn't two cartridges be recovered from outside this apartment building somewhere in either the grass, the sidewalk, or in the street? No cartridges introduced into evidence from outside the building.

(Emphasis supplied).

On the basis of the above quoted portions of the record, I am persuaded that the relief fashioned by the Circuit Court, which is entirely consistent with the provisions of Md. Rules 5–616(b)(4) and 5–806(a), *did* provide petitioner with a full and fair opportunity to attack the credibility of Ms. O'Carroll by introducing extrinsic evidence of weaknesses in her capacity to see what she claimed to have seen. Under these circumstances, rather than hold that petitioner is entitled to a new trial at which "the trial court should redact any portion [of Ms. O'Carroll's prior testimony] which related to what she might

have seen or testimony dependent upon her vision," I would affirm the judgment of the Court of Special Appeals.

Judge RODOWSKY has authorized me to state that he joins this dissenting opinion.