40 A.3d 416

**Leon DULYX a/k/a Leon Duylx**

v.

**STATE of Maryland.**

**No. 54, Sept. Term, 2011.**

Court of Appeals of Maryland.

March 21, 2012.

Brian M. Stanford, Assigned Public Defender (Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C.; Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Todd W. Hesel, Honors Attorney (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and DALE R. CATHELL (Retired, Specially Assigned), JJ.

BARBERA, J.

Maryland Rule 5–804(b)(1) allows for the admission of "former testimony" hearsay when the party against whom the declarant's statement is offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" of the declarant at a prior "action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding." We are asked in this case to determine whether the testimony of a witness at a pre-trial motion to suppress the witness's extrajudicial identification of Petitioner, Leon Dulyx A/K/A Leon Duylx, was admissible at Petitioner's trial by operation of Rule 5–804(b)(1). For the reasons that follow, we hold that Petitioner was not afforded at the suppression hearing an adequate opportunity to develop the witness's testimony. Consequently, the witness's testimony at that hearing was not admissible at Petitioner's trial under the "former testimony" hearsay exception.

## I.

On May 24, 2008, at approximately 6:30 p.m., two armed men robbed the GameStop video game store at 2436 North Charles Street in Baltimore City. They seized $150 from the register, a cell phone, and two wallets, before fleeing from the

store. On their way out, the robbers abducted 18–year–old DeAndre McIntyre, the store's lone customer, dragging McIntyre into the back seat of a gray Honda Accord that had been idling nearby. Both robbers joined McIntyre in the back seat, while a third man, who had not entered the GameStop, drove the Honda away from the scene. After a few minutes of driving around the Charles Village area of Baltimore City, McIntyre was forced out of the car at gunpoint.

Police investigation into the robbery focused almost immediately on Leon Dulyx (hereafter "Petitioner"). Eyewitness descriptions of the getaway car provided its license plate number, leading police to Petitioner's aunt, Joy Herbert, who is the car's registered owner. Ms. Herbert informed police that she did not use the vehicle on May 24, but Petitioner enjoyed unfettered access to the vehicle and was in possession of it during that day.

With that information in mind, Detective Kenneth Richard of the Baltimore City Police Department interviewed McIntyre, the only witness who had observed all three men involved in the robbery, at the police department's city-wide robbery office. When pressed by Detective Richard for a detailed description of the driver, McIntyre explained that he sat in the middle of the car's back seat during the abduction, so he was able only to observe the driver's light-brown facial complexion and braided hair. McIntyre could not give a more detailed physical description of the driver, such as height and weight, because he only observed the driver in a seated position.

Detective Richard then presented McIntyre with a photographic array containing six images, to determine whether McIntyre could identify Petitioner as one of the perpetrators of the robbery and abduction. McIntyre initially was unsure if any of the photos resembled the individual he observed driving the getaway vehicle. But, after looking over the images for a few moments McIntyre selected Petitioner's image and signed a statement on the back of the array that reads: "I was in gamestop and the two boy frost me in the car

at gun point. The person I pick out was driven the car and they push me out the car [sic]."

Detective Richard continued his investigation into the robbery, reviewing surveillance footage and questioning other witnesses, but those efforts failed to identify the other two men involved in the robbery and abduction. After a week of attempting without success to contact Petitioner in order to discuss the episode, Detective Richard swore out a warrant for Petitioner's arrest. Petitioner was arrested without incident and later charged with the crime of armed robbery and related offenses.

On the day of Petitioner's preliminary hearing in District Court, McIntyre arrived unexpectedly at the courthouse to recant his photo array identification of Petitioner. He asked to meet with the Assistant State's Attorney assigned to the preliminary hearing in Petitioner's case, explaining that "he did not feel like doing this [testifying about the identification]" because "he really didn't see [the driver] anyway." Instead, McIntyre claimed that he had selected Petitioner's photo because "a white detective pointed to [Petitioner's] picture." McIntyre made this recantation in the presence of Detective Richard, who at that time was meeting with the Assistant State's Attorney about Petitioner's preliminary hearing.

Two weeks later, McIntyre withdrew his recantation. When discussing the case with the Assistant State's Attorney assigned to prosecute Petitioner in Circuit Court, McIntyre was resolute in his identification of Petitioner and denied making any statements about not being able to identify the driver. The Assistant State's Attorney prosecuting Petitioner's case promptly filed a supplementary discovery disclosure about the episode, alerting defense counsel to it months before the circuit court proceedings in Petitioner's case.

Petitioner moved to suppress the photographic identification on due process grounds, arguing that Detective Richard conducted the identification procedure in an impermissibly suggestive manner. When the motion came for a hearing, Petitioner was the first to present evidence. He called McIntyre

to testify about Detective Richard's conduct of the photo array identification procedure.[1]

Petitioner, through counsel, began his examination of McIntyre by asking for his account of the events inside the GameStop immediately preceding the robbery. McIntyre explained that he entered the store looking for a specific video game and was inquiring about the price of the game when the two armed robbers entered the store. McIntyre gave a brief narrative of

---

1. The order in which evidence was presented at the suppression hearing was perhaps owing to the nature of the challenge McIntyre forwarded at the suppression hearing. We have explained:

> [T]he inquiry for due process challenges to extra-judicial identifications is a two step inquiry. The first is whether the identification procedure was impermissibly suggestive. If the answer is "no," the inquiry ends and both the extra-judicial identification and the in-court identification are admissible at trial. If, on the other hand, the procedure was impermissibly suggestive, the second step is triggered, and the court must determine whether, under the totality of the circumstances, the identification was reliable. We pointed out in [a prior case] that in the context of a pre-trial photo identification, unless and until the defendant establishes that the identification procedure was in some way suggestive, the reliability of a witness' identification is not relevant for due process purposes.

*Jones v. State*, 395 Md. 97, 109–10, 909 A.2d 650, 657–58 (2006) (internal citations, quotation marks and footnote omitted). Further,

> the burden is on the defendant to show, *prima facie*, that the pre-trial confrontation or viewing of photographs was illegal, and if he so shows, the burden shifts to the State to show by clear and convincing evidence that it was legal. If the court finds that the State has met its burden and that the pre-trial confrontation or viewing was legal, an in-court identification by the witness present at the pre-trial confrontation or viewing is admissible as substantive evidence. And if such witness made a pre-trial identification, his testimony to that effect is so admissible. And, the testimony of a third party present when the pre-trial identification was made is so admissible provided the out-of-court declarant is at the trial and subject to cross-examination; whether or not he makes an in-court identification. If the court finds that the pre-trial confrontation or viewing was illegal, any and all evidence of the pre-trial identification is *per se* inadmissible. The burden is then on the State to establish that the in-court identification offered had a source independent of the illegal pre-trial confrontation or viewing. It must do this "by clear and convincing evidence" that the in-court identification is based "upon observations of the suspect" by the witness other than the confrontation or photographic identifications.

*Id.* at 111, 990 A.2d at 658 (internal citations and quotation marks omitted).

the robbery and abduction as he experienced those events. Petitioner's counsel then asked for specific, descriptive details about the armed robbers, presumably to test the accuracy of McIntyre's ability to recall. Without objection by the State, the suppression court cut off questioning and the following ensued:

> THE COURT: Let's do this now. You know the rule, particularly with me, no depositions. No depositions. Focus right on the suppression. What is being suppressed here?
>
> [PETITIONER'S COUNSEL]: The ID, Your Honor.
>
> THE COURT: Alright, there came a time when—
>
> [PETITIONER'S COUNSEL]: I'm going to try to establish a foundation at least.
>
> THE COURT: He's now describing—okay, it's a fair question. I want to get this in perspective. I overrule the Judge.

Petitioner's counsel again asked McIntyre to describe the two robbers. The State, however, immediately objected:

> [THE STATE]: Objection, scope.
>
> THE COURT: Well, he can do that by—he's singling out one. They both had weapons.
>
> [PETITIONER'S COUNSEL]: Well, can we do one of them? The purpose is, if he has the ability to—it's just to test his ability to recall, in general, Your Honor. I mean, that's what the ID is about.
>
> [THE STATE]: Your Honor, respectfully, the Defendant is not alleged to be either of the two that came into the store. We are here to do photo array of the Defendant. If we could focus the scope to the Motion, like Your Honor was just saying. He's going to testify during trial.
>
> [PETITIONER'S COUNSEL]: Your Honor, it's one question and we'll move on. I'm not here to do Discovery at all.
>
> THE COURT: That's not true.
>
> [PETITIONER'S COUNSEL]: I think it establishes—

THE COURT: You're telling the Judge an untruth. I also think you're right. It's a double-edged matter and I can't deny you [one] edge because of the other edge. If the one edge is legitimate. I'm going to permit it.

You're going to limit it to one question, you said. You said describe the one who had the .38 or the one who had the shotgun or what?

Petitioner's counsel then asked McIntyre to describe the two robbers. McIntyre complied, characterizing one robber as six-foot, one-inch tall, "brown skinned" and "[c]hubby with braids"; and the other robber as five-foot, seven-inches tall, "brown-skinned," with "dreads" in his hair.

Petitioner's counsel continued the examination by asking McIntyre for details about the abduction. After McIntyre confirmed that he was "taken out to the car," Petitioner's counsel inquired whether McIntyre "eventually [got] into the car." Again, without the State's objection, the suppression court cut off questioning. The suppression court admonished Petitioner's counsel for posing that question, stating: "Come on, let's go—now I do think it's fair to respect the State's objection [as to scope] and go to the photos."

In accordance with the Court's instructions, the remainder of defense counsel's examination and McIntyre's testimony related solely to the conduct of the photo array procedure and his selection of Petitioner's photo. McIntyre's testimony on the subject, however, was neither clear nor straightforward. He testified that, upon viewing an array made up of three photographs,[2] he told police that he did not recognize any of the individuals in the photos. Then, according to McIntyre, the lead officer responded by questioning him, "you sure he ain't [sic] on there," and cautioning him, "don't lie to me," prompting McIntyre to identify one of the pictures as "someone who was involved in th[e] alleged crime." When asked if any of the officers "forced" him to choose a picture, McIntyre

---

2. The photo array submitted into evidence at trial, contained in the record before us, and, presumably, presented to McIntyre at the identification interview, displays six photographs.

responded "yes, sir." When asked to clarify whether the officers forced him to choose a particular picture (as opposed to being forced to submit to the identification procedure, and thus, forced to choose a picture generally), McIntyre gave evasive and contradictory answers. McIntyre both agreed that he "pick[ed] the photo out on [his] own," and agreed that "there [were] comments made by the police officer telling [him that he] should pick a certain person."[3] Finally, McIntyre offered that, "[w]hen I picked the guy out [from the photo array], that's when the officer was like, yes, that is the right one because another man had a picture of him, of the photo," implying that the officer only influenced McIntyre's selection *after* he had made it on his own.

On cross-examination, McIntyre confirmed that he wrote and signed the statement on the photo array that read: "The person I pick out was driven [sic] the car." Petitioner did not ask McIntyre about his previous recantation of the identification or his subsequent withdrawal of that recantation. Following the conclusion of McIntyre's testimony, the suppression court denied Petitioner's motion to suppress the identification.

Petitioner's trial began the next day. The State presented its case first, examining five witnesses and offering into evidence a number of audio and video exhibits. Two GameStop employees testified about what happened inside the GameStop store. Detective Richard testified about the photo array procedure and the resulting identification by McIntyre. And Ms. Herbert, Petitioner's aunt, testified about her circumstantial knowledge of Petitioner's access to the getaway vehicle. None of the witnesses provided direct, eyewitness testimony linking Petitioner to the robbery and abduction.

---

3. Representative of McIntyre's testimony during the suppression hearing is his explanation of the police officer's comments directing McIntyre to pick a certain photo: "Yeah [there were such comments], because he [ (it is not clear to whom "he" refers) ] had a picture. He said he had a picture on his camera-phone. When we drove by GameStop, the man was in the back, he was like, I'm a witness ... I have it on my camera-phone. I have a picture of the person. Yeah, that's the right man, right there. That's what he was telling me."

Likewise, the audiotape and videotape exhibits failed to link Petitioner to the robbery and abduction. One of the exhibits was a recording of a 911 call made by an eyewitness who watched the two robbers and McIntyre get into the getaway vehicle. The caller provided physical descriptions of the two robbers and a description of the getaway vehicle but did not describe the driver of the getaway vehicle. The other audio-tape exhibit was a recording of jailhouse telephone conversations between Petitioner and Ms. Herbert, and Petitioner and an unknown female caller. The recording evidenced Petitioner's anger at having to face the criminal charges and general remorse for his life situation but did not approach the level of a confession to the crimes charged. The videotape exhibit was a recording made by the surveillance camera inside of the GameStop at the time of the robbery. That recording provided visual evidence of the two robbers but not of the driver of the getaway vehicle parked outside.

To link Petitioner with the robbery and abduction, the State intended to examine McIntyre. McIntyre, though obviously present at the suppression hearing the day before the start of trial, failed to appear at any time during the three-day trial. The State therefore moved the court to declare McIntyre unavailable and admit his suppression hearing testimony into evidence as "former testimony," pursuant to Maryland Rule 5–804(b)(1).[4] The court, on hearing the State's summary of its efforts at locating McIntyre, declared McIntyre unavailable. Petitioner's counsel did not take issue with the court's declaration of McIntyre's unavailability, but counsel did object to the court's admission into evidence of a videotape-recording of McIntyre's suppression hearing testimony.

---

4. Md. Rule 5–804(b)(1) provides:
 (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) Former testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

After the close of the State's case, defense counsel made a motion for judgment of acquittal, which the trial court denied. Petitioner rested without putting on evidence. The trial court instructed the jury on the necessary law, the two sides submitted closing arguments, and the jury retired to deliberate. During its deliberations the jury listened a second time to the 911 recording and jailhouse conversation tapes. An hour after that, the jury returned its verdict finding Petitioner guilty of aiding and abetting a robbery and aiding and abetting theft under $500, and acquitting him of all other charges. The trial court imposed consecutive sentences of six years' imprisonment for the robbery charge and 18 months for the theft charge.

Petitioner appealed the judgments of conviction to the Court of Special Appeals, challenging, among other issues not pertinent here, that the Circuit Court erred under Maryland Rule 5–804(b)(1) and the Sixth Amendment's Confrontation Clause in allowing the State to introduce McIntyre's suppression hearing testimony at trial. Petitioner argued that the suppression court's limitation on his examination of McIntyre at that hearing deprived him of a full and fair opportunity to develop McIntyre's testimony. Consequently, Petitioner did not "confront" McIntyre, as required by the Sixth Amendment and the "opportunity" requirement of Rule 5–804(b)(1).

The Court of Special Appeals disagreed, and, in an unreported opinion, affirmed the judgments. The intermediate appellate court specifically noted that admission of McIntyre's suppression hearing testimony did not offend Petitioner's right to confront witnesses against him under the Sixth Amendment and the Maryland Rules. The court reasoned that Petitioner's motive to examine McIntyre at the suppression hearing was "substantially similar" to his motive to examine McIntyre at trial, and Petitioner had a full and fair opportunity to cross-examine McIntyre at the suppression hearing because the suppression court "only limited [an] embarked-upon line of questioning." Therefore, the Court of Special Appeals held that questions about infirmities in McIntyre's testimony "were neither precluded by the court nor attempted by [Petitioner]."

Petitioner filed with this Court a petition for a writ of certiorari to answer the following questions:

1. Did the Court of Special Appeals err when it held "that [Petitioner's] 'motive' to examine [the sole eyewitness against him] at the suppression hearing concerning police conduct during a photographic array identification was 'substantially similar' to Petitioner's motive to do so at trial"?

2. Did the Court of Special Appeals err when it held that Petitioner was given a "full and fair opportunity" to cross-examine the witness despite the substantial limitations placed on Petitioner's ability to question him?

We granted the petition. *Dulyx v. State*, 421 Md. 192, 25 A.3d 1025 (2011). We answer the second question in the affirmative and do not address the first.[5]

## II.

Maryland Rule 5–801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5–802 prohibits admission of hearsay statements into evidence, unless the hearsay statement falls within a narrow exception provided by rule, statute or constitutional provision.

■ Maryland Rule 5–804(b)(1) provides one such exception to the hearsay prohibition. As mentioned at the outset, that Rule allows for the admission of a prior statement made under oath by an unavailable witness so long as the party against

---

5. Although Petitioner's questions, as written, do not explicitly present a federal constitutional question, Petitioner nonetheless argues in his brief that the suppression court's admission of McIntyre's recorded testimony at trial violated Petitioner's Sixth Amendment right to confront witnesses against him. We do not reach that issue because we resolve in Petitioner's favor his challenge to the admissibility of the suppression hearing testimony by application of the Maryland Rules. *See Parker v. State*, 408 Md. 428, 435, 970 A.2d 320, 324–25 (2009) ("[T]his Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground.") (quoting *State v. Lancaster*, 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993) (alteration in original)).

whom the statement is offered had an "opportunity" and "similar motive" to develop the testimony of the witness when the prior statement was made, by direct, cross- or redirect examination. Md. Rule 5–804(b)(1); *see Tyler v. State*, 342 Md. 766, 774, 679 A.2d 1127, 1131 (1996). We have explained that "an opportunity to develop the testimony 'is generally satisfied when the defense [was] given a full and fair opportunity to probe and expose [the] infirmities [of the testimony] through cross-examination.'" *Williams v. State*, 416 Md. 670, 696, 7 A.3d 1038, 1053 (2010) (quoting *United States v. Salim*, 855 F.2d 944, 954 (2d Cir.1988)) (alterations in original). Likewise, a motive is "sufficiently similar" when "the party now opposing the testimony would have had, at the time the testimony was given, 'an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue' now before the court." *Id.*, 7 A.3d at 1053 (quoting *United States v. DiNapoli*, 8 F.3d 909, 914–15 (2d Cir.1993)).

 We review the admissibility of a hearsay statement under a different standard than the admissibility of some other evidence:

> We review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard. Review of the admissibility of evidence which is hearsay is different. Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is permitted by applicable constitutional provisions or statutes. Thus, a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo*.

*Parker*, 408 Md. at 436, 970 A.2d at 325 (quoting *Bernadyn v. State*, 390 Md. 1, 7–8, 887 A.2d 602, 606 (2005)) (quotation marks and citation omitted). We therefore must determine whether, as a matter of law, McIntyre's suppression hearing testimony meets the requirements of Rule 5–804(b)(1).

Petitioner argues that he enjoyed neither an "opportunity" nor a "similar motive" to develop McIntyre's testimony at the suppression hearing commensurate with the requirements of Rule 5–804(b)(1). Petitioner posits that his opportunity to develop McIntyre's testimony was foreclosed when "the trial judge confined the universe of questions that Petitioner's counsel could ask McIntyre," thereby barring Petitioner from probing "several infirmities in McIntyre's ... testimony." Petitioner points to the court's admonishments at the suppression hearing that prevented him from examining "McIntyre's ability to perceive and view Petitioner, inconsistencies in McIntyre's descriptions of the alleged perpetrators, and McIntyre's credibility based on his recantation." Petitioner further offers that his motive at the suppression hearing was solely to develop McIntyre's testimony regarding the suggestiveness and coerciveness during the photographic identification procedure, while at trial his motive was to challenge McIntyre's overall credibility.

The State disagrees, arguing that Petitioner had a full and fair opportunity to develop McIntyre's testimony at the suppression hearing and a motive to examine McIntyre at trial that was substantially similar to Petitioner's motive at the suppression hearing. The State asserts that Petitioner's lack of opportunity was not a product of the limitations the suppression court placed on Petitioner's examination, because the court merely precluded two questions that asked for cumulative and irrelevant testimony. Instead, the lack of opportunity, according to the State, was self-inflicted—a product of Petitioner's counsel's failure to ask questions about matters relevant to the identification procedure. The State further asserts that Petitioner was motivated at the suppression hearing to show that the photo array identification was impermissibly suggestive *and*, under the totality of the circumstances, unreliable.[6] Therefore, the State urges, Petitioner was moti-

---

6. The State is not altogether correct in asserting that Petitioner had a motive at the suppression hearing to show that McIntyre's identification was unreliable, as that term is used in constitutional parlance. As

vated to impeach the reliability of the identification procedure in the same way he was motivated to impeach McIntyre's overall reliability as a credible witness at trial, that is, by developing testimony about McIntyre's ability to perceive, or not, the events of the robbery and abduction.

Petitioner's argument that he lacked the "opportunity" required by Rule 5–804(b)(1) resolves the question. "[The] crucial question is whether, given that the opponent can not now cross-examine the witness, the examination on the prior occasion was fairly equivalent to cross-examination in the present situation." *Huffington v. State*, 304 Md. 559, 569, 500 A.2d 272, 277 (1985) (quoting Michael M. Martin, *The Former–Testimony Exception in the Proposed Federal Rules of Evidence*, 57 Iowa L.Rev. 547, 556 (1972)) (alteration in original). We have said that a prior occasion to cross-examine is "fairly equivalent," and the "opportunity" requirement is thereby satisfied, when the objecting party has enjoyed a "full and fair opportunity to probe and expose [the] infirmities [of the testimony] through cross-examination." *Williams*, 416 Md. at 696, 7 A.3d at 1053 (quoting *Salim*, 855 F.2d at 954) (alterations in original). That "full and fair opportunity" is afforded when the objecting party can "call[ ] to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Salim*, 855 F.2d at 954 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). Put a different way, if the objecting party was able to effectuate the principal purpose of cross-examination— "to challenge whether the declarant was sincerely telling what [she] believed to be the truth, whether the declarant accurately perceived and remembered the matter [she] related, and whether the declarant's intended meaning is adequately conveyed by the language [she] employed"—then that party has enjoyed an "opportunity" under 5–804(b)(1). *Id.* (quoting

discussed *supra* n. 1, the reliability of McIntyre's identification would have come into play, and would have been the State's burden to establish, only if Petitioner had been successful in establishing unnecessary suggestiveness in the identification procedure. Petitioner, as we have said, was unable to carry that burden.

*Ohio v. Roberts,* 448 U.S. 56, 70–71, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)) (alterations in original).

A witness examination illustrative of what is not a "full and fair" opportunity for cross-examination was presented in *Williams,* 416 Md. at 696, 7 A.3d at 1053. In *Williams,* a *Brady* violation [7] caused the retrial of the defendant, Williams, on charges of first-degree murder, use of a handgun in the commission of a violent crime and carrying a handgun. 416 Md. at 674, 683, 7 A.3d at 1040, 1045. But before his retrial, a key eyewitness, whose testimony at the first trial linked Williams to the murder, died. *Id.* at 683, 7 A.3d at 1045. Moreover, at a pretrial hearing before the second trial, a detective attached to the investigation in Williams's case disclosed for the first time that the eyewitness had "described herself to him as 'legally blind.' " *Id.* at 683, 7 A.3d at 1045. The State moved to have the eyewitness's videotaped testimony from the first trial played in front of the jury at the retrial and, over Williams's objection, the court granted the State's request. *Id.* at 684–86, 7 A.3d at 1046–47. The jury again found Williams guilty of first-degree murder, use of a handgun in the commission of a violent crime, and carrying a handgun. *Id.* at 686, 7 A.3d at 1047.

After the Court of Special Appeals affirmed Williams's conviction, Williams sought, and we granted, a writ of certiorari to hear the case. *Williams v. State,* 408 Md. 149, 968 A.2d 1064 (2009). Williams argued that the detective's failure to disclose the eyewitness's impairment until the retrial constituted another *Brady* violation, and the videotaped testimony should have been excluded from trial as inadmissible hearsay. *Williams,* 416 Md. at 690, 7 A.3d at 1049. In relation to the hearsay argument, Williams asserted that the videotaped testimony failed as "former testimony" because he did not have the chance at the first trial to cross-examine the deceased

---

7. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

eyewitness about her visual impairment, *id.*, 7 A.3d at 1049, rendering the witness's former testimony inadmissible as failing the "opportunity" prong of the Rule 5–804(b)(1) hearsay exception.

We agreed with Williams that, "although [Williams] may have had an opportunity to cross-examine [the eyewitness] at the first trial, it was not an adequate one." *Id.* at 697, 7 A.3d at 1054. We reasoned that an "opportunity" is furnished when the defense receives "a full and fair opportunity to probe and expose [the] infirmities [of the testimony] through the cross examination." *Id.* at 696, 7 A.3d at 1053 (quoting *Salim*, 855 F.2d at 954) (alterations in original). We reasoned that a visual impairment marked an infirmity in eyewitness testimony and Williams had not probed that infirmity because the detective failed to disclose it. *Id.* at 698, 7 A.3d at 1054 ("without knowing [the eyewitness's] statement to the detective [about her impairment], [Williams] would have no reason to believe that she was 'legally blind.' "). As a result, Williams was effectively estopped, by actions that were not his own, from probing and exposing an infirmity in the witness's testimony. We held that, because Williams was not afforded an opportunity to cross-examine, as mandated by Rule 8–504(b)(1), the witness's prior testimony was inadmissible hearsay. *Id.* at 697, 7 A.3d at 1054.

 Similarly here, Petitioner was not afforded an adequate opportunity to cross-examine McIntyre during the suppression hearing. The factual circumstances in this case give rise to a number of potential infirmities in McIntyre's testimony, including the accuracy of McIntyre's observations of the driver inside the getaway car and the veracity of McIntyre's identification in light of his attempted recantation. The suppression court, though, foreclosed defense counsel from asking questions about these infirmities at the suppression hearing.

The court's exhortation, "no depositions," communicated an effective restriction on the universe of questions available to Petitioner. That restriction was made explicit when the court directed Petitioner's counsel to "[f]ocus right on the suppres-

sion"; when the court limited Petitioner's counsel to a single question testing McIntyre's ability to recall details; and when the Court commanded "[c]ome on, let's go—now I do think it's fair to respect the State's objection and go to the photos." The court's restrictions prevented Petitioner's having a "full and fair opportunity" to probe whether McIntyre was sincere in stating at the suppression hearing what he believed to be the truth, and whether McIntyre accurately perceived and recalled what he had seen of the driver of the getaway car. *See Salim,* 855 F.2d at 954 (quoting *Roberts,* 448 U.S. at 70–71, 100 S.Ct. 2531). Moreover, Petitioner could not "call[ ] to the attention of the factfinder [a] reason[ ] for giving scant weight to the witness' testimony," *id.* (quoting *Fensterer,* 474 U.S. at 22, 106 S.Ct. 292), because the suppression court's directions effectively prevented counsel from questioning McIntyre about his attempted recantation.

We are not persuaded by the State's argument that the lack of opportunity was self-inflicted because Petitioner's counsel failed to ask questions about matters relevant to the identification procedure. The State urges that the limitations placed upon the proceeding by the suppression court "did not expressly or impliedly deny Dulyx the opportunity" to ask about certain perception or credibility infirmities in McIntyre's testimony. Even if this were accurate (which it is not), perception and credibility, the two infirmities that relate directly to the reliability of a photo identification are not the only infirmities a defense counsel could probe through cross-examination at trial. At trial, Petitioner's counsel may have wished to cross-examine McIntyre not just on the reliability of his extrajudicial identification of Petitioner but also on his reliability as a witness, generally. For example, Petitioner's counsel may have wished to probe whether McIntyre possessed any potential bias or prejudice, *see* Md. Rule 5–616(a)(4), or explore McIntyre's character for untruthfulness, *see* Md. Rule 5–616(a)(6). Petitioner's counsel did not enjoy the opportunity to explore those infirmities at the suppression hearing. As we have said, save for allowing one question about McIntyre's description of the other two robbers, the suppression court

limited counsel to questioning McIntyre about the conduct of the photo array procedure. *Cf.* Kenneth S. Broun, *McCormick On Evidence*, ch. 31 § 302, p. 346 (6th ed. 2006) ("[C]ircumstances may differ sufficiently between the prior hearing and the present trial to bar admission under this requirement, as where questions on a particular subject would have been largely irrelevant at the earlier proceeding.").

We hold that Petitioner did not enjoy an opportunity to develop McIntyre's testimony at the suppression hearing commensurate with the requirement of Rule 5–804(b)(1). McIntyre's transcript testimony was inadmissible hearsay and should not have been accepted into evidence by the trial court. Our analysis of the claim does not end here, however, because the State argues that, even if admission of McIntyre's testimony was error, the error was harmless and thereby requires affirmance of the judgments of conviction.

■ To determine whether the admission of McIntyre's suppression hearing testimony was harmless error, we adhere to our oft-cited rule:

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

■ Petitioner's counsel pointed out in closing argument that "this case is about ... an ID connecting and placing [Petitioner] at the crime scene." There was no physical evidence in the case identifying Petitioner as the driver, nor was there a live eyewitness at trial able to identify Petitioner as the driver. Only McIntyre observed the driver of the getaway vehicle, so only his suppression hearing testimony, wrongly admitted at trial, provided the jury with a direct link

between Petitioner and the robbery and abduction. Because we cannot "declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict," *Dorsey*, 276 Md. at 659, 350 A.2d at 678, the erroneous admission of McIntyre's testimony was not harmless. Petitioner's convictions must be reversed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**